1   DAN SIEGEL, SBN 056400
2   ANNE BUTTERFIELD WEILLS, SBN 139845
    EMILYROSE JOHNS, SBN 294319
3   SIEGEL, YEE, BRUNNER  & MEHTA
    475 14th Street, Suite 500
4   Oakland, California q94612
    Telephone: (510) 839-1200
5   Facsimile: (510) 444-6698
6   Emails: danmsiegel@gmail.com; abweills@gmail.com;
    emilyrose@siegelyee.com
7
8   *Attorneys for Plaintiffs*

9
                **UNITED STATES DISTRICT COURT**
10
            **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
11

12  ARMIDA RUELAS; DE'ANDRE EUGENE COX;    ) Case No. 4:19-cv-07637-JST
    BERT DAVIS; KATRISH JONES; JOSEPH       )
13  MEBRAHTU; DAHRYL REYNOLDS; MONICA       ) **NOTICE OF MOTION AND MOTION FOR**
    MASON; LUIS NUNEZ-ROMERO; SCOTT         ) **CLASS CERTIFICATION**
14  ABBEY; and all others similarly situated, )
                                            ) **Date:** September 8, 2022
15            Plaintiffs,                    ) **Time:** 2 p.m.
                                            ) **Ctrm:** 6 – 2nd Floor
16        vs.                               )        1301 Clay Street, Oakland, CA 94612
                                            )
17                                          )
    COUNTY OF ALAMEDA; GREGORY J. AHERN,    )
18  SHERIFF; ARAMARK CORRECTIONAL           ) Hon. Jon S. Tigar
    SERVICES, LLC; and DOES 1 through 10,   )
19                                          )
20            Defendants.                   )
                                            )
21                                          )
                                            )
22  _____    )

23

24

25

26

27

28

1

**NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION**

2

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

3

PLEASE TAKE NOTICE that on September 8, 2022, at 2:00 p.m., or as soon thereafter as the

4

matter may be heard before the Honorable Jon S. Tigar, in Courtroom 6 – 2nd Floor, 1301 Clay Street,

5

Oakland, California, plaintiffs Armida Ruelas, De'Andre Eugene Cox, Bert Davis, Katrish Jones, Joseph

6

Mebrahtu, Dahryl Reynolds, Monica Mason, Luis Nunez-Romero, and Scott Abbey will and hereby do

7

move this Court for an order certifying this proceeding as a class action pursuant to Rules 23 of the Federal

8

Rules of Civil Procedure. The proposed class and subclass, on whose behalf the representative plaintiffs

9

named in the First Amended Complaint bring constitutional and statutory claims, are defined below.

10

Plaintiffs further request an order appointing the undersigned counsel to represent the certified class and

11

subclass pursuant to Rule 23(g). This motion is supported by the following Memorandum of Points and

12

Authorities and the accompanying Declarations of Dan Siegel, Carmen Cuzma, and EmilyRose Johns,

13

including the exhibits attached thereto.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

I.      INTRODUCTION ............................................................................................................. 1

II.     STATEMENT OF FACTS ............................................................................................... 2

     A.      Aramark and the County Employ Pretrial Detainees to Prepare Meals for Persons
           Incarcerated in Santa Rita Jail and Jails in Other Counties. ................................... 2

     B.      Sheriff's Deputies Screen, Hire and Discipline Kitchen Workers and Aramark Assigns Duties
           and Supervises Their Daily Work. ........................................................................... 3

     C.      Kitchen Workers Worked According to the Shifts to Which They Were Assigned. .............. 4

     D.      Conditions in Santa Rita Jail Housing Units. ........................................................... 5

     E.      Each Class Representative Worked for Aramark and The County in the Kitchen. ................. 5

III.    LEGAL ARGUMENT ..................................................................................................... 8

     A.      Plaintiffs Have Met the Requirements of Rule 23(a). ............................................. 9

          1.      The Size of the Class and Subclass Each Satisfy Numerosity. ......................... 9

          2.      Commonality Is Met Because Plaintiffs Challenge Policies and Practices Created by
                Defendants and Applied to all Kitchen Workers. ....................................... 10

                a.      Commonality Is Satisfied as to the Class. ........................................ 12

                b.      Commonality Is Satisfied as to the Equal Protection Subclass. ................ 15

          3.      The Named Plaintiffs' Claims Are Typical the Class and Subclass. .................. 16

                a.      Named Plaintiffs' Claims Are Typical of the Class. ............................ 16

                b.      The Women Named Plaintiffs' Claims Are Typical of the Subclass. ............ 17

          4.      The Named Plaintiffs and Their Counsel Will Adequately Protect the Interests of the
                Class and Subclass. ......................................................................... 17

     B.      The Class and Subclass Should Be Certified Under F.R.C.P. 23(b)(2). ..................... 18

          1.      Plaintiffs Have Standing for Injunctive and Declaratory Relief. ...................... 19

                a.      The Controversy Is Capable of Repetition Yet Evades Review. .................. 20

                b.      Putative Class Members Will Have Standing at the Time of Certification. ... 21

          2.      Damages Sought by Plaintiffs are Incidental to Declaratory Relief and Are Available
                Under Rule 23(b)(2). ....................................................................... 22

     C.      The Class May in the Alternative Be Certified Under Rule 23(b)(3). ......................... 23

          1.      The Questions Common to the Class and Subclass Predominate. ...................... 23

          2.      A Class Action Is Superior to Other Methods. ........................................... 24

IV.     CONCLUSION ............................................................................................................... 25

# TABLE OF AUTHORITIES

**FEDERAL CASES**

*A.D. ex rel. L.D. v. Hawaii Dep't of Educ.,*
    727 F.3d 911 (9th Cir. 2013) ............................................................ 20

*Alba v. Papa John's USA, Inc.,*
    2007 WL 953849, at *1 (C.D. Cal. Feb. 7, 2007) ................................ 9

*Allison v. Citgo Petroleum Corp.,*
    151 F.3d 402 (5th Cir. 1998) ...................................................... 22, 23

*Am. C.L. Union of Nevada v. Lomax,*
    471 F.3d 1010 (9th Cir. 2006) ........................................................ 21

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds,*
    568 U.S. 455 (2013) ............................................................ 9, 23, 24

*Armstrong v. Davis,*
    275 F.3d 849 (9th Cir. 2001) ................................................. passim

*Baby Neal for & by Kanter v. Casey,*
    43 F.3d 48 (3d Cir. 1994) ......................................................... 16, 19

*Bates v. United Parcel Serv.,*
    204 F.R.D. 440 (N.D. Cal. 2001) ...................................................... 9

*Bautista-Perez v. Holder,*
    2009 WL 2031759, at *1 (N.D. Cal. July 9, 2009) ............................. 22

*Cal. Rural Legal Assistance, Inc. v. Legal Servs. Corp.,*
    917 F.2d 1171 (9th Cir. 1990) ........................................................ 16

*Californians for Disability Rights, Inc., v. Cal. Dep't of Transp.,*
    249 F.R.D. 334 (N.D. Cal. 2008) ...................................................... 9

*Cel–Tech Commc'ns, Inc. v. Los Angeles Cellular Tele. Co.,*
    20 Cal.4th 163 (1999) .................................................................. 13

*Demery v. Arpaio,*
    378 F.3d 1020 (9th Cir. 2004) ........................................................ 20

*Dukes v. Wall-Mart Stores, Inc.,*
    603 F.3d 571 (9th Cir. 2010) ............................................................ 8

*Dukes v. Wal-Mart, Inc.,*
    509 F.3d 1168 (9th Cir. 2007) ........................................................ 21

*Escalante v. California Physicians' Serv.,*
    309 F.R.D. 612 (C.D. Cal. 2015) .................................................... 10

*Esplin v. Hirschi,*
    402 F. 2d 94 (10th Cir. 1968) ........................................................ 24

*Evans v. Linden Rsch., Inc.,*
    2012 WL 5877579, at *1 (N.D. Cal. Nov. 20, 2012) ............................ 9

*Evon v. Law Offices of Sidney Mickell*,
    688 F.3d 1015 (9th Cir.2012) ........................................................................ 10

*Gerstein v. Pugh*,
    420 U.S. 103 (1975) ........................................................................................ 20

*Gest v. Bradbury*,
    443 F.3d 1177 (9th Cir. 2006) ...................................................................... 19

*Gonzalez v. United States Immigr. & Customs Enf't*,
    975 F.3d 788 (9th Cir. 2020) ........................................................................ 11

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1988) ................................................ 10, 16, 17, 23

*Harrison v. Kernan*,
    971 F.3d 1069 (9th Cir. 2020) ...................................................................... 15

*Hernandez v. Cty. of Monterey*,
    305 F.R.D. 132 (N.D. Cal. 2015) .................................................................... 9

*In re Memorex Sec. Cases*,
    61 F.R.D. 88 (N.D. Cal. 1973) ...................................................................... 24

*In re N. Dist. Of Cal., Dalkon Shielf IUD Prods. Liabl. Litig.*,
    693 F.2d 847 (9th Cir. 1982) ........................................................................ 17

*Jaegel v. Cnty. of Alameda*,
    2010 WL 334862, at *1 (N.D. Cal. Jan. 22, 2010) ...................................... 24

*Johnson v. GMRI, Inc.*,
    2007 WL 2462101, at *1 (E.D. Cal. Aug. 27, 2007) .................................... 21

*Jordan v. County of L.A.*,
    669 F.2d 1311 (9th Cir.) ................................................................................ 18

*Knapps v. City of Oakland*,
    647 F. Supp. 2d 1129 (N.D. Cal. 2009) ........................................................ 14

*LaDuke v. Nelson*,
    762 F.2d 1318 (9th Cir.1985) ........................................................................ 21

*Local Joint Exec. Bd. of Culinary/Bartender Tr. Fund v. Las Vegas Sands, Inc.*,
    244 F.3d 1152 (9th Cir. 2001) ...................................................................... 24

*Lozano v. AT & T Wireless Servs., Inc.*,
    504 F.3d 718 (9th Cir. 2007) ........................................................................ 13

*Martinez-Rodriguez v. Giles*,
    31 F.4th 1139 (9th Cir. 2022) ...................................................................... 14

*Mazza v. Am. Honda Motor Co., Inc.*,
    666 F.3d 581 (9th Cir.2012) ........................................................................ 11

*McGarry v. Pallito*,
    687 F.3d 505 (2d Cir. 2012) .......................................................................... 13

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Menocal v. GEO Grp., Inc.*,
 320 F.R.D. 258 (D. Colo. 2017) ................................................................ 14, 24

*Mitchell v. Corelogic, Inc.*,
 2018 WL 6118444, at *1 (C.D. Cal. Aug. 7, 2018) ...................................... 21

*Molski v. Gleich*,
 318 F.3d 937 (9th Cir. 2003) ...................................................................... 22

*Morgan v. United States Soccer Fed'n, Inc.*,
 2019 WL 7166978, at *1 (C.D. Cal. Nov. 8, 2019) .................................... 9, 10

*Novoa v. GEO Grp., Inc.*,
 2019 WL 7195331, at *1 (C.D. Cal. Nov. 26, 2019) .................................... 25

*O'Shea v. Littleton*,
 414 U.S. 488 (1974) .................................................................................. 19

*Owino v. CoreCivic, Inc.*,
 36 F.4th 839 (9th Cir. 2022) ...................................................................... 25

*Parsons v. Ryan*,
 754 F.3d 657 (9th Cir. 2014) .............................................................. passim

*Perry-Roman v. AIG Ret. Servs., Inc.*,
 2009 WL 10673231, at *1 (C.D. Cal. June 10, 2009) .................................. 21

*Reese v. Cty. of Sacramento*,
 888 F.3d 1030 (9th Cir. 2018) .................................................................... 14

*Rice v. City of Philadelphia*,
 66 F.R.D. 17 (E.D.Pa.1974) .................................................................. 22, 23

*Rodriguez v. Hayes*,
 591 F.3d 1105 (9th Cir. 2010) .............................................................. 15, 19

*Rodriguez v. Holder*,
 2011 WL 13294658, at *1 (C.D. Cal. Mar. 8, 2011) .................................... 10

*Rosenberg v. Renal Advantage, Inc.*,
 2013 WL 3205426, at *1 (S.D. Cal. June 24, 2013) .................................... 21

*Spencer v. Kemna*,
 523 U.S. 1 (1998) ...................................................................................... 20

*Thomas v. Baca*,
 231 F.R.D. 397 (C.D. Cal. 2005) ................................................................ 23

*Tyson Foods, Inc. v. Bouaphakeo*,
 577 U.S. 442 (2016) .................................................................................. 23

*United States v. Kozminski*,
 487 U.S. 931 (1988) .............................................................................. 13, 14

*United States v. Sanchez-Gomez*,
 __ U.S. __, 138 S. Ct. 1532 (2018) ............................................................ 20

*United States v. Virginia ("VMI"),*
    518 U.S. 515 (1996) .................................................................................................. 15

*Wal-Mart Stores, Inc. v. Dukes,*
    564 U.S. 338 (2011) ....................................................................................... 10, 12, 16

*Walters v. Reno,*
    145 F.3d 1032 (9th Cir. 1998) ................................................................................. 19

*Wang v. Chinese Daily News, Inc.,*
    737 F.3d 538 (9th Cir. 2013) ................................................................................... 22

*Where Do We Go Berkeley v. California Dep't of Transportation,*
    32 F.4th 852 (9th Cir. 2022) ................................................................................... 20

*Wolff v. McDonnell,*
    418 U.S. 539 (1974) ................................................................................................. 13

*Zinser v. Accufix Rsch. Inst., Inc.,*
    253 F.3d 1180 (9th Cir. 2001) ................................................................................. 22

**STATE CASES**

*Kasky v. Nike*, Inc.,
    27 Cal. 4th 939 (2002) ............................................................................................ 13

**STATUTES**

18 U.S.C. § 1589(a) ...................................................................................................... 14

Cal. Bus. & Prof. Code § 17200 .................................................................................. 13

Fed. R. Civ. P. 23(a) ............................................................................................. 8, 9, 17

Fed. R. Civ. P. 23(a)(2) ................................................................................................ 10

Fed. R. Civ. P. 23(a)(3) ................................................................................................ 16

Fed. R. Civ. P. 23(b) .................................................................................................... 19

Fed. R. Civ. P. 23(b)(3) ........................................................................................... 23, 24

Fed. R. Civ. P. 23(g) .................................................................................................... 18

*Wal-Mart Stores, Inc. v. Dukes,*
    564 U.S. 338 (2011) ....................................................................................... 10, 12, 16

**OTHER AUTHORITIES**

Kaplan,
    A Prefatory Note, 10 B.C. Ind. & Com. L.Rev. 497, 497 (1969) ........................... 24

**TREATISES**

WILLIAM B. RUBENSTEIN, ET AL.,
    NEWBERG ON CLASS ACTIONS, § 3.12 at 198 (5th ed. 2011) ............................ 9

## I.       INTRODUCTION

Plaintiffs Armida Ruelas, De'Andre Eugene Cox, Bert Davis, Katrish Jones, Joseph Mebrahtu, Dahryl Reynolds, Monica Mason, Scott Abbey, and Luis Nunez-Romero are current and former pretrial detainees who performed labor during their detention at Santa Rita Jail for Aramark Correctional Services, LLC, a private company. Aramark employed the labor of plaintiffs to produce meals sold to the County of Alameda to be served in Santa Rita Jail and to jails in other counties. Plaintiffs did not receive wages or any other compensation for their labor.

Plaintiffs brought suit against Alameda County, which operates Santa Rita Jail, and Aramark, which contracts with Alameda County ("the County") to provide food services to its carceral institutions and to use the uncompensated labor of detainees to provide those services.[1] Named plaintiffs now seek certification of their proposed class. Class representatives Armida Ruelas, Katrish Jones, and Monica Mason seek to represent a subclass of women incarcerated at Santa Rita Jail.

Plaintiffs seek to certify a class and a subclass. The Class consists of: all pretrial detainees who work or who have worked for Aramark in the Santa Rita Jail Kitchen during the period November 20, 2015 and the present, without compensation. The Class seeks relief from all defendants under the following claims: Thirteenth Amendment, Trafficking Victims Protection Reauthorization Act ("TVPRA"), Due Process Clause of the Fourteenth Amendment, California Labor Code, California Unfair Competition Law ("UCL"), and California Bane Act. The subclass, the "Equal Protection Subclass," consists of all women who worked for Aramark in the Santa Rita Jail Kitchen during the period November 20, 2015 to the present, without compensation. The Subclass seeks relief from all defendants for plaintiffs' claim under the Equal Protection Clause of the Fourteenth Amendment.

Representative plaintiffs' circumstances are uniquely suited to a class action. All share the experience of having been detained in Santa Rita jail and having worked for Aramark in a kitchen located in Santa Rita jail during a time when they were incarcerated as pretrial detainees. All putative class members were subjected to uniform policies and practices that purposefully eliminate nonconformity and perpetuate a penological environment where detainees are reliant upon the officers of the jail and the institutions with

---

[1] Defendants' interlocutory appeal to the Ninth Circuit of this Court's refusal to dismiss plaintiff's claims under the California Labor Code is pending. (See *Armida Ruelas, et al v. County of Alameda, et al.,* No. 21-80075).

---

*Ruelas v. County of Alameda,* Case No. 4:19-cv-07637-JST
Notice of Motion and Motion for Class Certification- 1

which the jail partners. All putative subclass members were subjected to uniform policies and practices with respect to the assignment of women to work in the kitchen.

The Class and Subclass meet the numerosity, commonality, typicality, and adequacy required to be certified as a class under Federal Rule of Civil Procedure 23(a). They move here to represent a Rule 23(b)(2) class for injunctive relief, declaratory relief, and incidental monetary damages, or in the alternative, a Rule 23(b)(2) class for injunctive and declaratory relief and a Rule 23(b)(3) damages class.

## II.    STATEMENT OF FACTS

### A.    Aramark and the County Employ Pretrial Detainees to Prepare Meals for Persons Incarcerated in Santa Rita Jail and Jails in Other Counties.

In 2015, the County of Alameda and Sheriff Gregory Ahern awarded a contract to Aramark to provide meals to prisoners in Santa Rita Jail. (ARAMARK_00001-00002, attached as Exhibit A to the Declaration of EmilyRose Johns in Support of Plaintiffs' Motion for Class Certification, ("Johns Decl."), ¶ 2). In a letter from Sheriff Ahern to the Alameda County Board of Supervisors, he explained that the contract with Aramark would rely on "inmate labor" to produce all meals provided to incarcerated persons at Santa Rita. (*Id.*)

Food prepared by kitchen workers in Santa Rita Jail is served at Alameda County, Amador County, and San Joaquin County jails. (Deposition of Richard Huking, ("Huking Depo."), 9:14-10:2; 18:19-25; 19:20-20:4, attached as Exhibit B to Johns Decl., ¶ 3.) Employees incarcerated at Santa Rita prepare meals for the 2000 to 2350 people in custody at Santa Rita. (Huking Depo., 18:19-19:18, Johns Decl., ¶ 3, Ex. B.) Employees incarcerated at Santa Rita also prepare three meals for 1,400 prisoners daily at San Joaquin County Jail and three meals for 100 prisoners daily at Amador County Jail. (Huking Depo., 20:5-18, Johns Decl., ¶ 3, Ex. B.) Aramark receives a daily roster of who it must feed each day and uses that roster to determine the number of meals it must produce. (Huking Depo., 18:4-17, Johns Decl., ¶ 3, Ex. B.)

Employees incarcerated at Santa Rita receive no compensation for their labor. (Aramark Correctional Services, LLC'S Responses to Plaintiffs' Requests for Admission, Set One ("RFA"), attached as Exhibit C to Johns Decl., ¶ 4.) Nor did defendants provide pretrial detainees with good time credits. (Aramark RFA Resp.; Johns Decl., ¶ 4; Ex. C; County of Alameda and Sheriff Gregory J. Ahern's Responses to Plaintiffs' Requests for Admission, Set One ("RFA"), attached as Exhibit D to Johns Decl., ¶ 5.)

**B.      Sheriff's Deputies Screen, Hire and Discipline Kitchen Workers and Aramark Assigns Duties and Supervises Their Daily Work.**

The majority of persons confined in Santa Rita jail are pretrial detainees. (Deposition of Sergeant Garrett Dagneau ("Dagneau Depo."), 13:13-19, attached as Exhibit E to Johns Decl., ¶ 6.) Persons who work in the kitchen are selected from the minimum security population, which consists mostly of pretrial detainees. (Dagneau Depo., 11:19-12:14, Johns Decl., ¶ 6, Ex. E; Deposition of Deputy John Marvin Sims Jr. ("Sims Depo."), 21:6-8, attached as Exhibit F to Johns Decl., ¶ 7.) Deputies assigned to the kitchen select prisoners to be screened for eligibility to work. (Dagneau Depo., 11:19-12:14, Johns Decl., ¶ 6, Ex. E.) People incarcerated at Santa Rita jail can be designated as eligible to work at intake to the jail if they worked in the kitchen previously and have returned to jail. (Dagneau Depo., 29:7-30:5, Johns Decl., ¶ 6, Ex. E.) The deputies compile names and send them to the jail's classification unit. (Dagneau Depo., 11:19-12:14, Johns Decl., ¶ 6, Ex. E.) Classification staff screens the prisoners to see if they meet any criteria that would make them ineligible to work in the kitchen. (Dagneau 16:18-21, Johns Decl., ¶ 6, Ex. E.) If classification staff approves the person to work, classification staff sends the name back to the kitchen staff. (Dagneau Depo., 16:11-17, Johns Decl., ¶ 6, Ex. E.) Aramark relies on the County to screen the potential incarcerated employee for suitability to work in the kitchen. (Huking Depo., 23:1-8, Johns Decl., ¶ 3, Ex. B.) The kitchen staff determines who to hire and reports those decisions to classification staff, who move the new employees to the worker housing unit. (Dagneau Depo., 10:15-20; 16:11-17, Johns Decl., ¶ 6, Ex. E.) The worker housing unit is less crowded and affords more tolerable living conditions than other units. (Sims Depo., 51:6-10, Johns Decl., ¶ 7, Ex. F.) Kitchen workers also receive more food, more movement, more time out of their cells, and more social interaction with non-incarcerated people. (Sims Depo., 50:16-51: 10, Johns Decl., ¶ 7, Ex. F; Dagneau Depo., 27:12-21, ¶ 6, Ex. E.)

Once hired, Aramark conducts a 15-30 minute orientation that consists of telling the kitchen workers where to wash their hands, where the lavatory is, and what breaks they are permitted. (Huking Depo., 44:19-45:14, Johns Decl., ¶ 3, Ex. B.) Non-incarcerated Aramark employees supervise the kitchen workers when they are in the kitchen. (Huking Depo., 68:23-69:2, Johns Decl., ¶ 3, Ex. B.) Aramark requires kitchen workers to show up to work in clean uniforms, which are laundered daily. (Huking Depo., 26:4-8; 27:12-17, Johns Decl., ¶ 3, Ex. B.) Aramark provides gloves and hair nets for kitchen workers to wear. (Huking Depo., 27:25-28:9; 29:1-15, Johns Decl., ¶ 3, Ex. B.) Aramark assigns kitchen workers to their work stations daily,

---

sometimes with input from Sheriff's deputies. (Huking Depo., 34:14-35:5, Johns Decl., ¶ 3, Ex. B.) Aramark determines the workload on a daily basis. (Sims Depo., 21:21-22:18, Johns Decl., ¶ 7, Ex. F.) A list of daily kitchen assignments for kitchen workers is prepared by Aramark. (Sims Depo., 27:3-22, Johns Decl., ¶ 7, Ex. F.)

Sheriff's deputies bring kitchen workers to the kitchen and Aramark employees supervise the kitchen workers during their kitchen shifts. (Sims Depo., 27:18-22, Johns Decl., ¶ 7, Ex. F.) Sheriff's deputies are in the kitchen during work shifts. (Huking Depo., 48:22-49:1, Johns Decl., ¶ 3, Ex. B.) They bring the worker rosters and provide security in the kitchen. (Huking Depo., 49:14-18, Johns Decl., ¶ 3, Ex. B.) Aramark employees bring to the attention of deputies any incarcerated employee whom they consider disruptive or uncooperative. (Huking Depo., 50:17-51:4, Johns Decl., ¶ 3, Ex. B.) Kitchen workers whom Aramark staff determines take too many breaks or are otherwise unproductive are removed from the workforce and the worker housing unit. (Huking Depo., 52:9-53:2, Johns Decl., ¶ 3, Ex. B.) Kitchen workers who are fired or who refuse to work are moved out of the worker housing unit. (Sims Depo., 49:14-20; 49:21-50:5, Johns Decl., ¶ 7, Ex. F; Dagneau Depo., 20:3-8, Johns Decl., ¶ 6, Ex. E.)

**C.  Kitchen Workers Worked According to the Shifts to Which They Were Assigned.**

Currently, Aramark has two shifts in the kitchen and sometimes a third cleaning shift. (Huking Depo., 14:8-13, Johns Decl., ¶ 3, Ex. B.) The two shifts are divided into a morning shift and an evening shift. (Huking Depo., 14:14-22, Johns Decl., ¶ 3, Ex. B.) The morning shift has 15 to 24 prisoners and the evening shift has 15 to 20. (Huking Depo., 15:23-16:6, Johns Decl., ¶ 3, Ex. B.) Prior to COVID, male kitchen workers worked one shift, from 7 a.m. to 3 p.m. (Huking Depo., 72:10-24, Johns Decl., ¶ 3, Ex. B.) Following COVID, Aramark changed to two shifts, one from 7 a.m. to 1:45 p.m. and one from 11 a.m. to 5:30 p.m. (Huking Depo., 72:10-24, Johns Decl., ¶ 3, Ex. B.) Persons assigned to work in the kitchen typically worked five days a week with two days off. (Sims 42:16-43:6, Johns Decl., ¶ 7, Ex. F.)

Women once worked in the kitchen, but in 2021, the County no longer assigned women to work in the kitchen. (Huking Depo., 85:12-23, Johns Decl., ¶ 3, Ex. B.) When women prisoners worked, they worked on the cleaning crew, which came in after hours. (Huking Depo., 86:6-9, Johns Decl., ¶ 3, Ex. B.) The cleaning shift for women was approximately three to four hours and began at 7 or 7:30 p.m. (Plaintiff Armida Ruelas' Response to Defendant Aramark Correctional Services, LLC's Interrogatories, Set One, ("Rogs. Resp."), attached as Exhibit G to Johns Decl., ¶ 8; Plaintiff Katrish Jones' Response to Defendant

Aramark Correctional Services, LLC's Interrogatories, Set One, attached as Exhibit H to Johns Decl., ¶ 9; Plaintiff Monica Mason's Response to Defendant Aramark Correctional Services, LLC's Interrogatories, Set One, attached as Exhibit I to Johns Decl., ¶ 10.)

### D.    Conditions in Santa Rita Jail Housing Units.

Prisoners in Santa Rita Jail are served meals prepared by kitchen workers. (Huking Depo. 18:19-25, Johns Decl., ¶ 3, Ex. B.) There is a known stigma regarding those meals. (Huking Depo., 65:18-66:4, Johns Decl., ¶ 3, Ex. B.) Meals were sent out on trays that were dirty. (Deposition of De'Andre Eugene Cox, ("Cox Depo."), 115:24-116:12, attached as Exhibit K to Johns Decl., ¶ 12.) Food was contaminated by vermin. (Deposition of Bert Davis, ("Davis Depo."), 149:23-150:9, attached as Exhibit M to Johns Decl., ¶ 14; Exhibit 1 to the Deposition of Scott Abbey, ("Abbey Depo."), 42:3-44:16, attached as Exhibit P to Johns Decl., ¶ 17.) If there are not enough deputies to release prisoners for free time, they will be confined for the whole day. (Abbey Depo., 39:11-40:22, Johns Decl., ¶ 17, Ex. P.) Other units can be loud, unsafe and more akin to a "madhouse" where you cannot sleep. (Davis Depo., 60:3-15, Johns Decl., ¶ 14, Ex. M; Cox Depo., 53:11-16, Johns Decl., ¶ 12 ,Ex. K.)

Workers in the kitchen get a "good meal" when they work. (Huking Depo., 83:21-84:3, Johns Decl., ¶ 3, Ex. B.) They live in a very clean and organized housing unit with others who are more stable, as compared to the other units in the jail. (Huking Depo., 84:9-18, Johns Decl., ¶ 3, Ex. B.) The housing unit is less crowded and affords more tolerable living conditions than other units. (Sims Depo., 51:6-10, Johns Decl., ¶ 7, Ex. F.) Workers also receive more food, more movement, more time out of their cells, and more social interaction with other prisoners and non-incarcerated people. (Sims Depo., 50:16-51: 10, Johns Decl., ¶ 7, Ex. F; Dagneau Depo., 27:12-21. ¶ 6, Ex. E.)

### E.    Each Class Representative Worked for Aramark and The County in the Kitchen.

Armida Ruelas has been detained in Santa Rita Jail multiple times. (Deposition of Armida Ruelas, ("Ruelas Depo."), 13:20-14:11, attached as Exhibit J to Johns Decl., ¶ 11.) She was most recently detained in the Jail between 2018 and 2020. (Ruelas Depo., 13:20-14:11, Johns Decl., ¶ 11, Ex. J.) Ms. Ruelas worked in Aramark's kitchen at the jail ("the Kitchen") in 2019. (Ruelas Depo., 15:17-21, Johns Decl., ¶ 11, Ex. J.) She was a pretrial detainee until she took a plea and was sentenced on or about November 27, 2019. (Ruelas Rogs. Resp., Johns Decl., ¶ 8, Ex. G.) Ms. Ruelas worked the evening cleaning shift except for a brief time in October and November 2019 when she worked the day shift while men were on strike. (Ruelas

Rogs. Resp., Johns Decl., ¶ 8, Ex. G; ECF No. 48, ¶ 37.) Ms. Ruelas found the kitchen work to be a temporary escape from the forced idleness of detention. (Ruelas Depo., 29:8-30:21, Johns Decl., ¶ 11, Ex. J.) She received unused undergarments because of her status as a worker. (Ruelas Depo., 81:25-82:12; Johns Decl., ¶ 11, Ex. J.) She sought out an attorney to commence litigation against defendants because she believed it was unfair that other entities were being enriched by her uncompensated labor. (Ruelas Depo., 83:15-84:22; 95:4-96:18, Johns Decl., ¶ 11, Ex. J.)

De'Andre Eugene Cox was detained at Santa Rita Jail on multiple occasions and worked in the Kitchen in 2019. (Cox Depo., Johns Decl., ¶ 12, Ex. K.) He was a pretrial detainee until he was sentenced on or about April 5, 2019. (Cox Depo., 12:6-13:5, Johns Decl., ¶ 12, Ex. K; Plaintiff De'Andre Eugene Cox's Response to Defendant Aramark Correctional Services, LLC's Interrogatories, Set One, attached as Exhibit L to Johns Decl., ¶ 13.) He worked in the scullery, sanitation, and was "on the line." (Cox Depo., 13:6-11, Johns Decl., ¶ 12, Ex. K.) He received additional food and better quality food because of his employment. (Cox Depo., 135:5-14, Johns Decl., ¶ 12, Ex. K.)

Bert Davis was detained at Santa Rita Jail on multiple occasions. (Davis Depo., 35:15-36:4, Johns Decl., ¶ 14, Ex. M.) Mr. Davis worked in the Kitchen between 2016 and 2019. (Davis Depo., 13:7-19, Johns Decl., ¶ 14, Ex. M.) He entered a plea on or about February 25, 2019 and he was sentenced on or about April 23, 2019. (Plaintiff Bert Davis' Response to Defendant Aramark Correctional Services, LLC's Interrogatories, Set One, attached as Exhibit N to Johns Decl., ¶ 15.) Mr. Davis held a variety of positions in the Kitchen, including in the bakery, cold prep, sanitation, and the scullery. (Davis Depo., 48:12-19, Johns Decl., ¶ 14, Ex. M.) Mr. Davis received more food and had more freedom of movement because he worked in the Kitchen. (Davis Depo., 147:1-16, Johns Decl., ¶ 14, Ex. M.)

Katrish Jones was detained in Santa Rita Jail on multiple occasions. (Deposition of Katrish Jones, ("Jones Depo."), 8:25-9:15, attached as Exhibit O to Johns Decl., ¶ 16.) She worked in the Kitchen three times between 2019 and 2021. (Jones Depo., 8:25-9:15, Johns Decl., ¶ 16, Ex. O.) She was not convicted during part of that period. (Jones Depo., 37:9-25, Johns Decl., ¶ 16, Ex. O; Jones Rogs. Resp., Johns Decl., ¶ 9, Ex. H.) Ms. Jones's employment afforded better meals and an escape from boredom. (Jones Depo., 19:7-17; 52:16-23; 14:25-15:4, Johns Decl., ¶ 16, Ex. O.)

Scott Abbey was a pretrial detainee at Santa Rita Jail from November 2018 to on or about December 21, 2018, and post-conviction from that date until August 2019. (Abbey Depo., 13:2-15, Johns Decl., ¶ 17, Ex. P; Plaintiff Scott Abbey's Response to Defendant Aramark Correctional Services, LLC's Interrogatories, Set One, attached as Exhibit Q to Johns Decl., ¶ 18.) He worked in the Kitchen at that time. (Abbey Depo., 12:24-13:1, Johns Decl., ¶ 17, Ex. P.) He received an extra mattress, a pillow, and better food because of his employment status. (Abbey Depo., 20:7-15; 47:6-13, Johns Decl., ¶ 17, Ex. P.)

Ms. Mason was detained at Santa Rita Jail on multiple occasions, most recently between December 2017 and February 2020. (Deposition of Monica Mason, ("Mason Depo."), 11:2-12, attached as Exhibit R to Johns Decl., ¶ 19.) She was pretrial until she entered a plea on August 17, 2019. (Mason Rogs. Resp., Johns Decl., ¶ 10, Ex. I.) She worked five days per week in the scullery at the Kitchen from April to July 2019 and October to November 2019. (Mason Depo., 11:2-12; 15:5-7; 15:19-16:5; 18:8-25, Johns Decl., ¶ 19, Ex. R.) She worked on the evening cleaning crew, the shift for which was usually 7 p.m. to 11 p.m. (Mason Rogs. Resp., Johns Decl., ¶ 10, Ex. I.). Ms. Mason received an occasional extra mattress or pillow and she was able to leave the confinement of the pod because of work. (Mason Depo., 16:8-18, Johns Decl., ¶ 19, Ex. R.)

Mr. Reynolds was incarcerated at Santa Rita Jail on or about June 19, 2018. (Plaintiff Dahryl Reynolds' Response to Defendant Aramark Correctional Services, LLC's Interrogatories, Set One, ("Rogs. Resp."), attached as Exhibit S to Johns Decl., ¶ 20.) He was temporarily released due to COVID-19 in March 2020 and retuned in June 2020. (Reynolds Rogs. Resp., Johns Decl., ¶ 20, Ex. S.) He was again temporarily released in June 2020 until and returned in March 2021. (Reynolds Rogs. Resp., Johns Decl., ¶ 20, Ex. S.) He was pretrial for the duration of his incarceration until he was convicted and sentenced on September 15, 2020. (Reynolds Rogs. Resp., Johns Decl., ¶ 20, Ex. S.)

Mr. Reynolds began working in the kitchen on or about July 1, 2018 and worked until March 2020. (Reynolds Rogs. Resp., Johns Decl., ¶ 20, Ex. S; AC-ACSO000284, Johns Decl., ¶ 21, Ex. T.) He worked Friday through Wednesday and had just Thursdays off. (Reynolds Rogs. Resp., Johns Decl., ¶ 20, Ex. S.) He worked from around 6 a.m. to 3:30 p.m. and about once a week would work an extra shift from 3:30 to 7 p.m. (Reynolds Rogs. Resp., Johns Decl., ¶ 20, Ex. S.) He began working in the scullery and moved to the sandwich line after a few months. (Reynolds Rogs. Resp., Johns Decl., ¶ 20, Ex. S.) When he worked a 3:30 p.m.-7 p.m. shift, it was in sanitation. (Reynolds Rogs. Resp., Johns Decl., ¶ 20, Ex. S.) When he worked,

Mr. Reynolds received a meal to replace the meal he missed while working. (Reynolds Rogs. Resp., Johns Decl., ¶ 20, Ex. S.) Typically, the meal was of reasonable quality rather than the poor quality food prisoners at the jail were typically served. (Reynolds Rogs. Resp., Johns Decl., ¶ 20, Ex. S.)

Mr. Mebrahtu has been incarcerated multiple times in the jail. (AC-ACSO000281-283, Johns Dec., ¶ 22, Ex. U.) He resided in the kitchen worker unit indicating he worked in the kitchen from January 19, 2016 to January 30, 2016, March 23, 2016 to April 4, 2016, July 7, 2016 to August 1, 2016, September 17, 2016 to October 11, 2016, April 24, 2017 to August 15, 2017, October 26, 2017 to November 15, 2017, July 29, 2019 to August 25, 2019, September 17, 2019 to December 26, 2019, and August 24, 2020 to September 4, 2020. (AC-ACSO000281-283, Johns Decl., ¶ 22, Ex. U.)

Mr. Nunez-Romero was incarcerated multiple times between 2015 and 2021. (AC-ACSO000284, attached as Exhibit V to the Declaration of EmilyRose Johns in Support of Plaintiffs' Motion for Class Certification, ("Johns Decl."), ¶ 23.) He resided in the kitchen worker unit indicating he worked in the kitchen from June 3, 2019 to March 10, 2020. (AC-ACSO000284, Johns Decl., ¶ 23, Ex. V.) He also received an extra mattress and a pillow. (AC-ACSO000284, Johns Decl., ¶ 23, Ex. V.)

## III.   LEGAL ARGUMENT

Rule 23 of the Federal Rules of Civil Procedure requires that a party seeking class certification show that: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact that are common to the class; (3) the claims or defenses of the representative parties are typical of those of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a); *Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001) *abrogated on other grounds by Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 967 (9th Cir. 2018). The decision to certify a class is committed to the discretion of the district court. *Armstrong*, 275 F.3d at 871, n. 28.

While a district court must "perform a rigorous analysis to ensure that the prerequisites of Rule 23 have been satisfied, and this analysis will often, though not always, require looking behind the pleadings to issues overlapping with the merits of the underlying claims," no party may "turn the certification decision into a trial." *Dukes v. Wall-Mart Stores, Inc.*, 603 F.3d 571, 594, 591 (9th Cir. 2010), *reversed on other grounds by Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011). "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Connecticut Ret. Plans &*

1  *Tr. Funds*, 568 U.S. 455, 466 (2013). *See also Parsons v. Ryan*, 754 F.3d 657, 676 (9th Cir. 2014) (that the

2  Court may inquire into the merits of a case for the purpose of determining whether the class meets the

3  requirements of Rule 23 "does *not* mean that the plaintiffs must show at the class certification stage that

4  they will *prevail* on the merits." (emphasis in original)).

   **A.     Plaintiffs Have Met the Requirements of Rule 23(a).**

   **1.     The Size of the Class and Subclass Each Satisfy Numerosity.**

7  Numerosity is satisfied if the class is "so numerous that joinder of all members is impracticable."

8  Fed. R. Civ. P. 23(a)(1). "'[I]mpracticable' does not mean impossible; it refers only to the difficulty or

9  inconvenience of joining all members of the class." *Alba v. Papa John's USA, Inc.*, No. CV 05-7487 GAF

10  (CTX), 2007 WL 953849, at *5 (C.D. Cal. Feb. 7, 2007). *See also Morgan v. United States Soccer Fed'n,*

11  *Inc.*, No. 219CV01717RGKAGR, 2019 WL 7166978, at *6 (C.D. Cal. Nov. 8, 2019) (considering it

12  inefficient and unduly burdensome to manage a case with at least 25 members where the legal issue facing

13  the proposed class is the same).

14  A party seeking class certification "do[es] not need to state the exact number of potential class

15  members, nor is a specific number of class members required for numerosity." *Bates v. United Parcel*

16  *Serv.*, 204 F.R.D. 440, 444 (N.D. Cal. 2001). However, "[a] class or subclass with more than forty

17  members 'raises a presumption of impracticability based on numbers alone.'" *Hernandez v. Cty. of*

18  *Monterey*, 305 F.R.D. 132, 153 (N.D. Cal. 2015) (*quoting* WILLIAM B. RUBENSTEIN, ET AL.,

19  NEWBERG ON CLASS ACTIONS, § 3.12 at 198 (5th ed. 2011)). *See also Californians for Disability*

20  *Rights, Inc., v. Cal. Dep't of Transp.*, 249 F.R.D. 334, 346 (N.D. Cal. 2008) ("various courts have found

21  that the numerosity factor is satisfied if the class comprises 40 or more members").

22  The numerosity requirement is satisfied as to both the Class and the Subclass. The County's worker

23  rosters demonstrate that well more than 1,100 incarcerated persons worked for Aramark during the

24  statutory period. (See Declaration of Carmen Cuzma in Support of Plaintiffs' Motion for Class Certification

25  ("Cuzma Dec.") ¶ 7.)[2] Although the records do not differentiate between pretrial detainees and persons who

26  _____

27  [2] Ms. Cuzma sampled the daily worker rosters produced by defendants by selecting one day a month—the
   11th—and identifying each unique name marked as having worked. (Cuzma Dec. ¶¶ 3-6.) Such sampling is

28  commonly used to support a finding of numerosity. *See, e.g.*, *Evans v. Linden Rsch., Inc.*, No. C 11-01078
   DMR, 2012 WL 5877579, at *11 (N.D. Cal. Nov. 20, 2012) ("Although the exact size of the proposed class

have been convicted and sentenced, the majority of the jail is pretrial detainees, and potential workers are identified from the intake unit, and, in some instances, upon intake. (Dagneau 11:19-12:14; 13:13-19; 29:7-30:5.)Using the same rosters, it is clear that more than 110 women worked for Aramark during the statutory period. Cuzma Dec. ¶ 8.) The Class and Subclass are sufficiently numerous for class certification, given the size of the Class, the large number of the Class and the impracticability of joinder.

Further, where plaintiffs seek declaratory and injunctive relief as they do here, certifying a class serves the interests of judicial economy. *Morgan*, 2019 WL 7166978, at *6 (numerosity where there are at least 50 members of the proposed class); *Escalante v. California Physicians' Serv*., 309 F.R.D. 612, 618 (C.D. Cal. 2015) (class of 19 meets numerosity requirement where plaintiffs seek declaratory and injunctive relief).

### 2.   Commonality Is Met Because Plaintiffs Challenge Policies and Practices Created by Defendants and Applied to all Kitchen Workers.

To meet the commonality requirement, there must be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The Ninth Circuit has construed this requirement "permissively." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1988) *overruled on other grounds by Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011). The Supreme Court reiterated that class claims must "depend upon a common contention . . . [that is] capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350. In other words, "[w]hat matters to class certification . . . [is] the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Id.* (citation and quotation marks omitted). "Even a single [common] question will do." *Id.* at 359. *See also Parsons*, 754 F.3d at 675 ("Plaintiffs need not show . . . that every question in the case, or even a preponderance of questions, is capable of class wide resolution.") (internal citation and quotation omitted); *Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1029 (9th Cir.2012) ("Where the circumstances of each particular

currently is not known, the sampling evidence satisfies the numerosity requirement, based on a common sense extrapolation of the numbers and considering the geographical dispersion of class members."); *Rodriguez v. Holder*, No. CV0703239TJHRNBX, 2011 WL 13294658, at *1 (C.D. Cal. Mar. 8, 2011) ("As for numerosity, Plaintiff conducted a random sampling from the government's list of 352 class members, and the result indicated that each subclass would contain at least forty five immigrants. Joinder of all of these people would be impractical, and thus the subclasses satisfy numerosity.")

class member vary but retain a common core of factual or legal issues with the rest of the class, commonality exists.") (quotation marks and citation omitted); *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 589 (9th Cir.2012) ("[C]ommonality only requires a single significant question of law or fact.").

In a civil rights suit, "commonality is satisfied where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members . . . . In such circumstance, individual factual differences among the individual litigants or groups of litigants will not preclude a finding of commonality." *Armstrong*, 275 F.3d at 868. *See also Gonzalez v. United States Immigr. & Customs Enf't*, 975 F.3d 788, 808 (9th Cir. 2020) (commonality satisfied where plaintiffs seek to challenge an unlawful policy).

This is a quintessential civil rights case that challenges defendants' unlawful jail-wide policies and practices and seeks class-wide declaratory and injunctive relief as well as monetary damages, which are incidental to the harm perpetrated by the defendants' unlawful policies and procedures. In challenging the defendants' policies and practices regarding the failure to pay pretrial detainees whom they employ, plaintiffs raise a series of core questions of law and fact that, when answered, will resolve all class and subclass members' liability issues against defendants:

(1)     Whether defendants were plaintiffs' employer(s) and whether plaintiffs and the putative class worked for Aramark and/or the County of Alameda without compensation in violation of the California Labor Code;

(2)     Whether the County of Alameda denied plaintiffs and the putative class compensation without adequate notice or a meaningful opportunity to be heard in violation of their right to Due Process under the Fourteenth Amendment;

(3)     Whether Aramark committed an unfair business practice in violation of California's UCL when it used uncompensated labor to produce meals for sale;

(4)     Whether plaintiffs and putative class were coerced to work in violation of the Thirteenth Amendment, Trafficking Victims Protection Reauthorization Act ("TVPRA"), and/or the California Bane Act;

The Equal Protection Subclass asks a common question:

(1)    Whether defendants' policies and practices of assigning women prisoners to shorter shifts during later hours, and ultimately not assigning women prisoners to work in the kitchen at all, serves an important governmental objective and is substantially related to the achievement of that objective as required to satisfy intermediate scrutiny under the Equal Protection Clause of the Fourteenth Amendment.

This Court's consideration of these questions will "generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart*, 546 U.S. at 350 (internal citation omitted). These answers will be the foundation for determining whether defendants violated the Thirteenth and Fourteenth Amendments, the TVPRA, the California Labor Code, California's Unfair Competition Law, and the Bane Act, and whether declaratory relief, money damages, and an injunction directing defendants to remedy the unconstitutional conditions, practices, and policies common to the entire class and subclass is appropriate.

### a.    Commonality Is Satisfied as to the Class.

Commonality is necessarily established where there is a class-wide policy to which all class members are subjected. *Parsons*, 754 F.3d at 678. Here, there is no dispute that pretrial detainees work in the kitchen, that all pretrial detainees work who work in the Santa Rita Jail kitchen are not paid wages, that all prisoners who work in the kitchen are supervised by Aramark employees with security provided by and discipline doled out by Sheriff's deputies (Huking Depo., 49:14-18, 50:17-51:4, 52:9-53:2, Johns Decl., ¶ 3, Ex. B; Dagneau Depo., 11:19-12:14, Johns Decl., ¶ 6, Ex. E; Sims Depo., 21:6-8, ¶ 7, Ex. F.) Work in the kitchen is encouraged by providing an edible meal, slightly more tolerable and less dangerous living conditions, reduction of otherwise forced idleness, and more socialization. (Sims Depo., 50:16-51: 10, Johns Decl., ¶ 7, Ex. F; Dagneau Depo., 27:12-21, ¶ 6, Ex. E.) All class members and subclass members are subject to these policies, and the practices that amount to unwritten policies. All class members allege harm based on jail-wide policies and practices that govern work in the Kitchen. *Parsons*, 754 F.3d at 678 ("What all members of the putative class and subclass have in common is their alleged exposure, as a result of specified statewide ADC policies and practices that govern the overall conditions of health care services and confinement, to a substantial risk of serious future harm to which the defendants are allegedly deliberately indifferent.").

Plaintiffs' California Labor Code claims present common questions of law and fact. Defendants operate according to formal and informal policies to suffer or permit plaintiffs and the putative class to

1   work. Each plaintiff and putative class member is not paid for their work. Aramark and the County follow

2   common policies and procedures to hire, supervise, discipline, and terminate kitchen workers. (Sims Depo.,

3   49:14-20; 49:21-50:5, Johns Decl., ¶ 7, Ex. F; Dagneau Depo., 10:15-20, 16:11-17, 20:3-8, Johns Decl., ¶

4   6, Ex. E.) The answer to whether Aramark and the County are employers and whether plaintiffs and the

5   putative class are employees entitled to wages will apply class wide.

6        Plaintiffs' unfair competition claim also turns on common questions. "The UCL is a broad remedial

7   statute that permits an individual to challenge wrongful business conduct 'in whatever context such activity

8   might occur.'" *Lozano v. AT & T Wireless Servs., Inc.*, 504 F.3d 718, 731 (9th Cir. 2007) (*quoting Cel–*

9   *Tech Commc'ns, Inc. v. Los Angeles Cellular Tele. Co.*, 20 Cal.4th 163 (1999) (citation omitted). "It

10  prohibits 'unfair competition,' which it broadly defined as including 'any unlawful, unfair or fraudulent

11  business act or practice[.]'" *Id.* (*quoting* Cal. Bus. & Prof. Code § 17200.) "By defining unfair competition

12  to include any 'unlawful . . . business act or practice', the UCL permits violations of other laws to be

13  treated as unfair competition that is independently actionable." *Kasky v. Nike*, Inc., 27 Cal. 4th 939, 949

14  (2002). The question of whether defendants' policies and procedures applicable class-wide violate the law

15  and thus constitute an unfair business practice will generate common answers that drive the resolution of

16  the case.

17       Plaintiffs' due process claim also satisfies commonality because the system-wide practice is to not

18  pay or provide good time credits to pretrial detainees. Deprivation of a statutorily created benefit to which a

19  prisoner is entitled requires due process. *Wolff v. McDonnell*, 418 U.S. 539, 557 (1974). It is undisputed

20  that plaintiffs and the putative class received no wages or good time. (Aramark RFA, Johns Decl., ¶ 4, Ex.

21  C; County and Ahern RFA, Johns Decl., ¶ 5, Ex. D.) Plaintiffs and the putative class' statutory entitlement

22  to pay and/or to good-time credit is a common question, and the denial of any due process a common fact.

23       Finally, plaintiffs' Thirteenth Amendment, TVPRA and Bane Act claims turn on common questions

24  of law and fact. Each prohibits a defendant from obtaining labor from a detainee through coercion.

25  Threatened use of physical and legal coercion against a pretrial detainee to compel them to work violates

26  the Thirteenth Amendment. *McGarry v. Pallito*, 687 F.3d 505, 511 (2d Cir. 2012). *See also United States v.*

27  *Kozminski*, 487 U.S. 931, 952 (1988) ("[I]nvoluntary servitude' [under the Thirteenth Amendment]

28  necessarily means a condition of servitude in which the victim is forced to work for the defendant by the

1    use or threat of physical restraint or physical injury, or by the use or threat of coercion through law or the

2    legal process.")

3        Civil liability under the TVPRA is imposed on those who:

4        knowingly provide[] or obtain[] the labor or services of a person by any
         one of, or by any combination of, the following means—
5        (1) by means of force, threats of force, physical restraint, or threats of
         physical restraint to that person or another person;
6        (2) by means of serious harm or threats of serious harm to that person or
         another person;
7        (3) by means of the abuse or threatened abuse of law or legal process; or
         (4) by means of any scheme, plan, or pattern intended to cause the person
8        to believe that, if that person did not perform such labor or services, that
         person or another person would suffer serious harm or physical restraint.

9

10   *Martinez-Rodriguez v. Giles*, 31 F.4th 1139, 1149 (9th Cir. 2022) (*quoting* 18 U.S.C. § 1589(a)).

11       "The Bane Act civilly protects individuals from conduct aimed at interfering with rights that are

12   secured by federal or state law, where the interference is carried out 'by threats, intimidation or coercion.'"

13   *Reese v. Cty. of Sacramento*, 888 F.3d 1030, 1040 (9th Cir. 2018). *See also Knapps v. City of Oakland*, 647

14   F. Supp. 2d 1129, 1168 (N.D. Cal. 2009), *amended in part* (Sept. 8, 2009) ("To obtain relief under this

15   statute, a plaintiff must prove that a defendant tried to, or did, prevent the plaintiff from doing something

16   that he had the right to do under the law, or to force plaintiff to do something that he was not required to do

17   under the law.")

18       When examining whether labor was coerced, "the vulnerabilities of the victim are relevant in

19   determining whether the physical or legal coercion or threats thereof could plausibly have compelled the

20   victim to serve." *Kozminski*, 487 U.S. at 952. It is also important to consider that "the nature of detention is

21   unique in that it allows the detainer to almost fully control the experience of the detainee." *Menocal v. GEO*

22   *Grp., Inc.*, 320 F.R.D. 258, 265 (D. Colo. 2017), *aff'd*, 882 F.3d 905 (10th Cir. 2018).

23       Plaintiffs here have spent many years in and out of jail. (Ruelas Depo., 13:20-14:11, Johns Decl., ¶

24   11, Ex. J; Cox Depo., Johns Decl., ¶ 12, Ex. K; Davis Depo., 35:15-36:4, Johns Decl., ¶ 14, Ex. M; Jones

25   Depo., 8:25-9:15, Johns Decl., ¶ 16, Ex. O; Mason Depo."), 11:2-12, Johns Decl., ¶ 19, Ex. R; AC-

26   ACSO000281-283, Johns Decl., ¶ 22, Ex. U; AC-ACSO000284, Johns Decl., ¶ 23, Ex. V.) While in jail,

27   they are in an environment where deputies control their entire experience. *Menocal*, 320 F.R.D. at 265. The

28   housing units at Santa Rita jail are dismal. (*See supra* II.D.) In contrast, the kitchen housing unit has more

tolerable conditions and is organized, clean and stable. (Sims Depo., 50:16-51:10, Johns Decl., ¶ 7, Ex. 6; Huking Depo., 52:9-19; Johns Decl., ¶ 3, Ex. B.) Prisoners in the worker housing unit receive more food, more movement, more time out of their cells, and more social interactions with people who are not incarcerated. (Sims Depo., 50:16-51:10, Johns Decl., ¶ 7, Ex. 6.) They get a "good meal" as opposed to stigmatized jail food. (Huking 65:18-66:4; 83:21-84:3, Johns Decl., ¶ 3, Ex. B.) Workers are removed from these marginally suitable living conditions if they are not being productive to Aramark's satisfaction. (Huking 65:18-66:4; 83:21-84:3, Johns Decl., ¶ 3, Ex. B.)

The conditions and inducement tactics exist for all pretrial detainees who work in the kitchen. The question of whether these system-wide practices constitute coercion under the Thirteenth Amendment, TVPRA, and Bane Act are questions presented by the Class that will have class-wide answers. Any minor factual differences among members of the Class with respect to how and when coercion occurred does not undermine commonality. *See Armstrong*, 275 F.3d at 868 (rejecting defendant's argument that class was improperly certified in prison case alleging several forms of systemic disability discrimination and stating that "individual factual differences among the individual litigants or groups of litigants will not preclude a finding of commonality."). Instead, "the commonality requirement asks us to look only for some shared legal issue or a common core of facts." *Rodriguez v. Hayes*, 591 F.3d 1105, 1122 (9th Cir. 2010).

### b. Commonality Is Satisfied as to the Equal Protection Subclass.

The Equal Protection Subclass is composed of women plaintiffs who were not assigned equal work time as men and assigned to work less desirable hours and were thus deprived of equal out-of-cell time and equal opportunity to earn wages. Sex classifications "may not be used, as they once were . . . to create or perpetuate the legal, social, and economic inferiority of women." *United States v. Virginia ("VMI")*, 518 U.S. 515, 534 (1996). Prison regulations that "discriminate on the basis of gender, must receive intermediate scrutiny; that is, such regulations are constitutional only if the government demonstrates they 'serve[ ] important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives.'" *Harrison v. Kernan*, 971 F.3d 1069, 1076 (9th Cir. 2020) (*quoting VMI*, 518 U.S. at 533). Such regulations "must receive intermediate scrutiny in order to ensure that they do 'not rely on overbroad generalizations about the different talents, capacities, or preferences of [men and women].'" *Harrison*, 971 F.3d at 1078 (quoting *VMI*, 518 U.S. at 533). There is also no dispute that women worked a late night cleaning shift that was shorter than those the men worked, when women

were permitted to work at all. (Huking Depo., 85:12-23; 86:6-9, Johns Decl., ¶ 3, Ex. B  Defendants'
policies and practices are common to the Subclass, and the offered justification for the discriminatory
treatment of women will answer this question class wide. *Parsons*, 754 F.3d at 678.

### 3. The Named Plaintiffs' Claims Are Typical the Class and Subclass.

The requirements of Rule 23(a)(3) are met where named plaintiffs' claims are "typical of the claims
or defenses of the class." Fed. R. Civ. P. 23(a)(3). *See also Hanlon*, 150 F.3d at 1020 (describing the
typicality standard as "permissive," and finding typicality where claims are "reasonably co-extensive with
those of absent class members"). "The commonality and typicality requirements of Rule 23(a) tend to
merge." *Wal-Mart*, 564 U.S. at 349 n.5. Typicality exists "when each class member's claim arises from the
same course of events, and each class member makes similar legal arguments to prove the defendant's
liability." *Armstrong*, 275 F.3d at 868 (citations omitted). The Ninth Circuit has emphasized that it "do[es]
not insist that the named plaintiffs' injuries be identical with those of the other class members, only that the
unnamed class members have injuries similar to those of the named plaintiffs and that the injuries result
from the same, injurious course of conduct." *Id.* at 869. *See also Baby Neal for & by Kanter v. Casey*, 43
F.3d 48, 58 (3d Cir. 1994) ("where an action challenges a policy or practice, the named plaintiffs suffering
one specific injury from the practice can represent a class suffering other injuries, so long as all the injuries
are shown to result from the practice"); *Cal. Rural Legal Assistance, Inc. v. Legal Servs. Corp.*, 917 F.2d
1171, 1175 (9th Cir. 1990) (Rule 23 "does not require the named plaintiffs to be identically situated with all
other class members," only that their situations be "sufficiently parallel to insure a vigorous and full
representation of all claims for relief") (citation and quotation marks omitted).

#### a. Named Plaintiffs' Claims Are Typical of the Class.

"'Under the rule's permissive standards, representative claims are "typical" if they are reasonably
coextensive with those of absent class members; they need not be substantially identical.'" *Parsons*, 754
F.3d at 685 (*quoting Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir.1998)). "The test of typicality
is 'whether other members have the same or similar injury, whether the action is based on conduct which is
not unique to the named plaintiffs, and whether other class members have been injured by the same course
of conduct.'" *Id.* (*quoting Hanlon*, 150 F.3d at 1020). "Thus, '[t]ypicality refers to the nature of the claim or
defense of the class representative, and not to the specific facts from which it arose or the relief sought.'" *Id.*

(*quoting Hanlon*, 150 F.3d at 1020). "[C]ommonality and typicality requirements occasionally merge." *Id.* at 685.

"Where the challenged conduct is a policy or practice that affects all class members, the underlying issue presented with respect to typicality is similar to that presented with respect to commonality, although the emphasis may be different." *Armstrong*, 275 F.3d at 868-69. Here, all members of the putative class share the same or similar injury—working under coercive conditions without compensation and the other violations of law that flow from that conduct—and they are subject to the same or similar conduct by Aramark and the County. The named plaintiffs thus raise claims and assert injuries that are typical of the Class.

> **b.     The Women Named Plaintiffs' Claims Are Typical of the Subclass.**

Armida Ruelas, Monica Mason, and Katrish Jones, the representative plaintiffs of the Equal Protection Subclass, similarly seek to litigate claims that are typical of the Subclass. Because women all worked the same cleaning shift when they were assigned to work and because all women are now not assigned to work, (Huking Depo.,85:12-23; 86:6-9, Johns Decl., ¶ 3, Ex. B), they suffered "the same or a similar injury as the rest of the putative [subclass]; they allege that this injury is a result of a course of conduct that is not unique to any of them; and they allege that the injury follows from the course of conduct at the center of the class claims." *Parsons*, 754 F.3d at 685 (internal modifications and quotations omitted).

> **4.     The Named Plaintiffs and Their Counsel Will Adequately Protect the Interests of the Class and Subclass.**

Finally, plaintiffs meet the requirement that they will fairly and adequately represent the interests of the class. Fed. R. Civ. P. 23(a)(4). This inquiry depends on "the qualifications of counsel for the representatives, an absence of antagonism, a sharing of interests between representatives and absentees, and the unlikelihood that the suit is collusive." *In re N. Dist. Of Cal., Dalkon Shield IUD Prods. Liabl. Litig.*, 693 F.2d 847, 855 (9th Cir. 1982). "Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Hanlon*, 150 F.3d at 1020.

The class representatives do not have any interests that are antagonistic to the interests of the Class or Subclass. Both the class representatives and class members have a common interest in ensuring that pretrial detainees receive wages for the work they did and continue to do without compensation.

The Subclass representatives and the Subclass similarly have a common interest in ensuring that women are treated equally to their similarly situated male counterparts. The class representatives and subclass representatives have the same interest in declaratory and injunctive relief. The named plaintiffs all worked without pay for Aramark during their detention in Santa Rita jail. (*See supra* Section II. E.). Women kitchen workers all worked the same cleaning shift except for a brief period when the men went on strike and only women worked. (Huking Depo., 86:6-9, Johns Decl., ¶ 3, Ex. B; ECF No. 48, ¶ 37.)

Further, undersigned counsel will represent the Class and Subclass fairly, adequately, and zealously. Siegel, Yee, Brunner & Mehta is a 48-year-old law firm specializing in civil rights litigation. (Declaration of Dan Siegel in Support of Plaintiffs' Motion for Class Certification ("Siegel Dec."), ¶ 5.) The firm has served as counsel on class actions of this magnitude, and class counsel has the experience, knowledge of applicable law, and resources required to vigorously represent the Class. (Siegel Dec., ¶ 6; 10-11.) *See Jordan v. County of L.A.*, 669 F.2d 1311, 1323 (9th Cir.), *vacated on other grounds, County of L.A. v. Jordan*, 459 U.S. 810 (1982) (holding that adequacy of counsel can be met by showing that the named plaintiffs' attorneys are qualified, experienced, and generally able to conduct litigation).

Undersigned counsel also meets the requirements of Rule 23(g) and should therefore be appointed as class counsel. Fed. R. Civ. P. 23(g) ("a court that certifies a class must appoint class counsel"). In appointing class counsel, a court must consider: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." *Id.* Undersigned counsel has been heavily involved in the investigation and litigation of this matter for the past three years and has extensive knowledge experience litigating civil rights cases. (Siegel Dec. ¶¶ 6, 8-9.)

**B.      The Class and Subclass Should Be Certified Under F.R.C.P. 23(b)(2).**

"[Federal Rule of Civil Procedure] 23(b)(2) requires that 'the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.'" *Parsons*, 754 F.3d at 686 (citing Fed. R.

Civ. P. 23(b)(2)). "[T]he primary role of this provision has always been the certification of civil rights class actions." *Id.* The requirements of Rule 23(b)(2) "are unquestionably satisfied when members of a putative class seek uniform injunctive or declaratory relief from policies or practices that are generally applicable to the class as a whole." *Id.* at 688. The Class and Subclass meet the requirements of Rule 23(b)(2), because the plaintiffs primarily seek injunctive and declaratory relief against the defendants for their unlawful policies and procedures, and the damages that may flow from such a finding are incidental. As the Ninth Circuit has explained, the rule "was adopted in order to permit the prosecution of civil rights actions." *Walters v. Reno*, 145 F.3d 1032, 1047 (9th Cir. 1998). *See also Baby Neal*, 43 F.3d at 58 (noting that Rule 23(b)(2) is "almost automatically satisfied in actions primarily seeking injunctive relief"). Whether a class is certified under Rule 23(b)(2) depends on "whether class members seek uniform relief from a practice applicable to all of them." *Rodriguez*, 591 F.3d at 1125.

### 1.     Plaintiffs Have Standing for Injunctive and Declaratory Relief.

Plaintiffs have standing to seek certification under Rule 23(b)(2) for injunctive and declaratory relief. Plaintiffs must show "(1) [they have] suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Gest v. Bradbury*, 443 F.3d 1177, 1181 (9th Cir. 2006). "[P]ast wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury." *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974).

Plaintiffs here unquestionably suffered injury. They worked without compensation in violation of the law under the coercion of imprisonment. (Aramark RFA, Johns Decl., ¶ 4, Ex. C; County and Ahern RFA, Johns Decl., ¶ 5, Ex. D.) Ms. Mason, Ms. Ruelas, and Ms. Jones, representing the Equal Protection Subclass, have also suffered injury where it is undisputed that they were assigned shorter shifts at a less desirable time until being excluded completely because of their sex. Plaintiffs easily demonstrate injury-in-fact that is fairly traceable to the unlawful conduct of defendants and that can be redressed by an order of this Court where defendants engage in system-wide practices and have policies that drive the claims and injuries and where ceasing the unlawful behavior would end the harm and provide plaintiffs the remedies they are owed.

Although no plaintiff is currently incarcerated at Santa Rita Jail, they may still pursue their claims for injunctive relief because (1) the challenged harm is capable of repetition yet evading review and (2) even were it not, members of the putative class are still employed by Aramark and the County.

     **a.**     **The Controversy Is Capable of Repetition Yet Evades Review.**

Claims capable of repetition yet evading review, such as those at issue here, have long been held to be capable of judicial resolution. This long-standing exception to the mootness doctrine applies where "(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *Spencer v. Kemna*, 523 U.S. 1, 17 (1998) (internal quotation marks and brackets omitted). "The exception satisfied even when future challenges would come from different plaintiffs who would sue on similar grounds." *Where Do We Go Berkeley v. California Dep't of Transportation*, 32 F.4th 852, 857 (9th Cir. 2022). *See also A.D. ex rel. L.D. v. Hawaii Dep't of Educ.*, 727 F.3d 911, 914 (9th Cir. 2013) (finding no mootness where defendant was reasonably likely to face similar challenges again from other plaintiffs).

The exception applies in class actions where the named plaintiff does have a personal stake at the outset of the lawsuit, and where the claim may arise again with respect to the named plaintiff even if they are not currently subject to the deprivation. *Gerstein v. Pugh*, 420 U.S. 103, 110 n. 11 (1975). Pretrial detainees are plaintiffs for whom this exception uniquely applies. *Gerstein*, 420 U.S. at 110 n. 11. "Pretrial custody [is] inherently temporary and of uncertain length, such that [the Court cannot] determine 'that any given individual, named as plaintiff, would be in pretrial custody long enough for a district judge to certify the class.'" *United States v. Sanchez-Gomez*, __ U.S. __, 138 S. Ct. 1532, 1538 (2018) (*quoting Gerstein*, 420 U.S., at 110 n. 11). "At the same time, it [is] certain that there [will] always be some group of detainees subject to the challenged practice." *Id.*

To satisfy the second prong, there must be a reasonable likelihood that the same parties will be subject to the same action again. *Where Do We Go Berkeley*, 32 F.4th at 857. *See also Gerstein*, 420 U.S. at 110 n. 11 (not moot where the named plaintiff is not currently incarcerated pretrial but "[t]he attorney representing the named respondents is a public defender, and we can safely assume that he has other clients with a continuing live interest in the case.") In *Demery v. Arpaio*, 378 F.3d 1020 (9th Cir. 2004), the second prong was met where the plaintiffs, although no longer in the pretrial detention facility, had each been detained at the facility more than once. 378 F.3d at 1027. There exists such a reasonable likelihood here,

where defendants continue to run the kitchen using uncompensated labor of persons incarcerated pretrial. The record here contains compelling evidence that the plaintiffs likely will be reincarcerated. Class representatives Armida Ruelas, De'Andre Eugene Cox, Bert Davis, Katrish Jones, Dahryl Reynolds, and Monica Mason have all been incarcerated at Santa Rita Jail multiple times. (*See supra Section II.E*.) Further, the injury is likely to reoccur, as defendants' challenged acts are part of a "pattern of officially sanctioned ... behavior, violative of the plaintiffs' [federal] rights." *LaDuke v. Nelson*, 762 F.2d 1318, 1323 (9th Cir.1985). The Ninth Circuit has determined that "where the defendants have repeatedly engaged in the injurious acts in the past, there is a sufficient possibility that they will engage in them in the near future to satisfy the "realistic repetition" requirement." *Armstrong*, 275 F.3d at 861.

The injuries of which plaintiffs complain are capable of repetition, yet evading review.

**b.     Putative Class Members Will Have Standing at the Time of Certification.**

In addition to being capable of repetition yet evading review, the controversy is not moot where putative class members continue to work in the kitchen at Santa Rita Jail and will do so through certification. "[P]utative class members who were still [] employees as of June 8, 2001 (when Plaintiffs' complaint was filed) do have standing to seek the injunctive and declaratory relief requested in the complaint[.]" *Dukes v. Wal-Mart, Inc.*, 509 F.3d 1168, 1189 (9th Cir. 2007), *on reh'g en banc sub nom. Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571 (9th Cir. 2010), *rev'd on other grounds by*, 564 U.S. 338 (2011) (citing *Am. C.L. Union of Nevada v. Lomax*, 471 F.3d 1010, 1015 (9th Cir. 2006)). *See also Mitchell v. Corelogic, Inc.*, No. SACV172274DOCDFMX, 2018 WL 6118444, at *18 (C.D. Cal. Aug. 7, 2018) (allowing former employees to pursue injunctive relief for a class that included current employees); *Perry-Roman v. AIG Ret. Servs., Inc.*, No. CV0902287DOCRNBX, 2009 WL 10673231, at *2 (C.D. Cal. June 10, 2009) (same); *Johnson v. GMRI, Inc.*, No. CV F 07-0283 LJO DLB, 2007 WL 2462101, at *5 (E.D. Cal. Aug. 27, 2007) (same). In addition, for claims under the Unfair Competition Law, a former employee may bring a claim for equitable relief because such claims are filed on behalf of the wronged party and the general public. *Rosenberg v. Renal Advantage, Inc.*, No. 11-CV-2152-GPC-KSC, 2013 WL 3205426, at *10 (S.D. Cal. June 24, 2013), *aff'd*, 649 F. App'x 580 (9th Cir. 2016). This gives plaintiffs, even as former employees, standing to pursue equitable remedies such as an injunction and declaratory relief.

///

///

2.      **Damages Sought by Plaintiffs are Incidental to Declaratory Relief and Are Available Under Rule 23(b)(2).**

Where damages are "incidental" to injunctive or declaratory relief, a damages class may be certified under Rule 23(b)(2). *Zinser v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1195 (9th Cir.), *opinion amended on denial of reh'g*, 273 F.3d 1266 (9th Cir. 2001) (*citing Probe v. State Teachers' Retirement Sys.*, 780 F.2d 776, 780 (9th Cir.1986)) ("A class seeking monetary damages may be certified pursuant to Rule 23(b)(2) where such relief is 'merely incidental to [the] primary claim for injunctive relief.'"). *See also Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 544 (9th Cir. 2013) ("The Court [in *Wal-Mart v. Dukes*] left open the possibility that 'incidental' monetary claims could be brought in a Rule 23(b)(2) class action.").

Monetary damages are incidental when they "flow directly from liability to the class as a whole on the claims forming the basis of the injunctive or declaratory relief." *Molski v. Gleich*, 318 F.3d 937, 949 (9th Cir. 2003), *overruled on other grounds by Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571 (9th Cir. 2010) (quoting *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 414 (5th Cir. 1998)). Courts have found requests for declaratory relief in particular to predominate over requests for monetary relief where the award of damages flows directly from the declaratory relief and where damages are easily calculated by a formula that is uniformly applicable to the Class. *Bautista-Perez v. Holder*, No. C 07-4192 TEH, 2009 WL 2031759, at *10 (N.D. Cal. July 9, 2009); *Rice v. City of Philadelphia*, 66 F.R.D. 17, 20 (E.D.Pa.1974).

In *Bautista-Perez*, the court certified a class under Rule 23(b)(2) where representative plaintiffs sought to declare unlawful and enjoin a policy that allowed for a biometrics fee charged by Immigration and Naturalization Service in excess of the fees permitted by statute. 2009 WL 2031759, at *3. The fees were charged each time a class member registered and re-registered for Temporary Protected Status. *Id.* at *2. The court found that Rule 23(b)(2) status was appropriate where "[a]lthough the actual monetary sums extracted from individual class members varies according to the number of times the individual registered or re-registered, such relief does not defeat certification; monetary relief may accompany injunctive and declaratory relief." *Id.* at *10. "Even this monetary relief would be generally applicable, as it would be determined based on the sum paid in excess of the statutory limit, and not individual, personal factors." *Id.* Here, all plaintiffs across the Class and Subclasses request declaratory relief finding that defendants' acts and practices as described in the complaint violate their constitutional and statutory rights. Any damages would flow directly from that finding of liability and would be easily calculable as the minimum wage

multiplied by the hours per shift, which is consistent, and by the days the person worked. Incidental damages may flow from either injunctive *or* declaratory relief. *Rice*, 66 F.R.D. 17 at 20. A right to collect wages would flow directly from the determination of liability, and the damages are "capable of computation by means of objective standards and not dependent in any significant way on the intangible, subjective differences of each class member's circumstances." *Allison*, 151 F.3d at 415.

### C.      The Class May in the Alternative Be Certified Under Rule 23(b)(3).

If the Court declines to certify the Class under Rule 23(b)(2) or determines that incidental damages are not available under Rule 23(b)(2), plaintiffs ask that the Court to certify the classes under both Rule 23(b)(2) and Rule 23(b)(3). To qualify for certification under Rule 23(b)(3), a class must satisfy two conditions in addition to the Rule 23(a) prerequisites: class resolution must be "superior to other available methods for the fair and efficient adjudication of the controversy,'" and "common questions must predominate over any questions affecting only individual members." *Hanlon*, 150 F.3d at 1022 (citing Fed. R. Civ. P. 23(b)(3)).

### 1.      The Questions Common to the Class and Subclass Predominate.

A class predominates when the "proposed classes are sufficiently cohesive to warrant adjudication by representation." *Hanlon*, 150 F.3d at 1021. "Rule 23(b)(3), however, does *not* require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof." *Amgen Inc.*, 568 U.S. at 469 (internal quotations and modifications omitted) (emphasis in *Amgen*). "What the rule does require is that common questions '*predominate* over any questions affecting only individual [class] members.'" *Id.* (quoting Fed. R. Civ. P. 23(b)(3) (emphasis added in *Amgen*). "[T]he [predominance] determination rests not on whether individualized damages determinations will be necessary but on 'legal or factual questions that qualify each class member's case as a genuine controversy.'" *Thomas v. Baca*, 231 F.R.D. 397, 402 (C.D. Cal. 2005), *disapproved in later proceedings*, No. CV 04-08448 DDP SHX, 2012 WL 994090 (C.D. Cal. Mar. 22, 2012) (*quoting Amchem*, 521 U.S. at 623, 117 S.Ct. 2231).

A class presenting a common question that predominates is properly certified under Rule 23(b)(3) even where "'other important matters will have to be tried separately, such as . . . some affirmative defenses peculiar to some individual class members.'" *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016). In addressing predominance, the Court should be mindful that "the interests of justice require that in a doubtful case, . . . any error, if there is to be one, should be committed in favor of allowing the class action."

1   *Esplin v. Hirschi*, 402 F. 2d 94, 101 (10th Cir. 1968). *See also In re Memorex Sec. Cases*, 61 F.R.D. 88, 94

2   (N.D. Cal. 1973) (quoting this holding in *Esplin*).

3   　　　Plaintiffs challenge the uniform policies and practices that assign pretrial detainees to work in the

4   kitchen without compensating them, the universal practice of denying wages without due process, the

5   coercive and uniformly employed measures to induce their compliance, and the unfair competition practices

6   of Aramark. The Subclass challenges the uniform policies and practices that previously assigned women to

7   shorter shifts at less desirable hours and now do not assign them to work in the kitchen at all. Predominance

8   is present where "[t]he legal question presented by the named Plaintiffs . . . is the same with respect to the

9   unnamed class members." *Jaegel v. Cnty. of Alameda*, No. C 09-00242 CW, 2010 WL 334862, at *5 (N.D.

10  Cal. Jan. 22, 2010). Where a uniform and indiscriminate policy and practice is at issue, "liability can be

11  determined on a class-wide rather than an individual basis." *Id.* Further, any possible need for specific

12  damages determinations does not predominate here. As the court in *Menocal* found for the certified class in

13  that case, the damages due in the present action "could be determined by a formula and statistical sampling

14  taking into account the number of hours worked, type of work performed, and fair market value of such

15  work." 320 F.R.D. at 270.

16  　　　　　**2.　　A Class Action Is Superior to Other Methods.**

17  　　　A class action is also the superior method of resolving this controversy. When examining whether a

18  class action is a superior vehicle, courts should consider:

19  　　　　　(A) the class members' interests in individually controlling the prosecution or
　　　　　defense of separate actions;

20  　　　　　(B) the extent and nature of any litigation concerning the controversy already
　　　　　begun by or against class members;

21  　　　　　(C) the desirability or undesirability of concentrating the litigation of the
22  　　　　　claims in the particular forum; and
　　　　　(D) the likely difficulties in managing a class action.

23  Fed. R. Civ. P. 23(b)(3). This is a non-exhaustive list of considerations. *Local Joint Exec. Bd. of*

24  *Culinary/Bartender Tr. Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1163 (9th Cir. 2001). In including

25  these, the Advisory Committee foremost had in mind vindication of "'the rights of groups of people who

26  individually would be without effective strength to bring their opponents into court at all.'"*Amchem*, 521

27  U.S. at 617 (*quoting* Kaplan, A Prefatory Note, 10 B.C. Ind. & Com. L.Rev. 497, 497 (1969)). In cases

28  where class members are vulnerable, where there are risks to litigation, or where there is the possibility of

small recovery and relatively high costs of litigation, class actions are the superior vehicle. *See, e.g., Owino v. CoreCivic, Inc.*, 36 F.4th 839, 845 (9th Cir. 2022) (affirming the district court's justification for the superiority of a class action).

In this case, the putative class members are both in and out of detention. Those still incarcerated but not at Santa Rita are in prisons across the state or in federal custody around the county. Those out of custody reside in different localities. It is probable that many class members have little knowledge of the legal system and limited financial resources. These realities mean that class members are unlikely to advance litigation on their own behalf. Class members' "tenuous situations [] militates in favor of certification." *Novoa v. GEO Grp., Inc.*, No. EDCV172514JGBSHKX, 2019 WL 7195331, at *19 (C.D. Cal. Nov. 26, 2019). As such, the class action is the superior method of bringing these claims.

## IV.    CONCLUSION

Plaintiffs' action meets all the requirements of Rule 23(a) and (b). This Court should certify a class of "all pretrial detainees who work or who have worked for Aramark in the Santa Rita Jail Kitchen during the period November 20, 2015 and the present, without compensation" and a subclass, of "all women who worked for Aramark in the Santa Rita Jail Kitchen during the period November 20, 2015 and the present, without compensation".


Dated: July 1, 2022

                    SIEGEL, YEE, BRUNNER & MEHTA


                    By _/s/ EmilyRose Johns___
                          EmilyRose Johns

                    *Attorneys for Plaintiffs*