UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARMIDA RUELAS, et al., | Case No. 19-cv-07637-JST |
| Plaintiffs, | |
| v. | **ORDER DENYING MOTION FOR CLASS CERTIFICATION** |
| COUNTY OF ALAMEDA, et al., | Re: ECF No. 182 |
| Defendants. | |

Before the Court is Plaintiffs' motion for class certification, ECF No. 182. The Court will deny the motion.

**I.      BACKGROUND**

Plaintiffs filed this putative class action on November 20, 2019, and the amended complaint on November 8, 2024, which brings claims under the Thirteenth Amendment to the United States Constitution, the Trafficking Victims Protection Act ("TVPA"), the Equal Protection and Due Process Clauses of the Fourteenth Amendment to the U.S. Constitution, California's Unfair Competition Law ("UCL"), and California's Bane Act. ECF No. 1; ECF No. 160. The amended complaint alleges that Plaintiffs are or were "pre-trial detainees, detainees facing deportation, [and] federal detainees" confined in Alameda County's Santa Rita Jail. ECF No. 160 ¶ 1. Starting as early as July 2015, Plaintiffs performed "industrial food preparation services and cleaning" for Aramark, pursuant to a contract between Aramark and the County. *Id.* ¶¶ 1, 21. "Aramark is a private, for-profit company that sells food prepared by prisoners to third parties" outside of Alameda County. *Id.* ¶ 1.

Aramark's contract with Alameda County allows Aramark "to employ persons imprisoned in Santa Rita Jail without compensating them." *Id.* ¶ 21. "Prisoners prepare and package food" in

Santa Rita's kitchen "and clean and sanitize the kitchen" after preparation. *Id.* ¶ 22. "Aramark employees manage the kitchen operation and observe the Sheriff's deputies' supervision of the prisoner-employees." *Id.* Employees of Aramark "supervise the quality and amount of work that prisoners accomplish" and "supervise prisoner-employee conduct and report misconduct to the deputies for discipline." *Id.* ¶ 23. Further, Aramark "establishes quotas for prisoners that dictate how much work prisoners must complete before their shift ends" and "determines from its quotas how many prisoner-employees are required to work and how many shifts are required." *Id.* ¶ 24.

Plaintiffs allege that County Defendants may "remove [prisoner-employees'] eligibility to work in the jail and subject them to disciplinary action" if Sheriff's deputies are "displeased with the quality or quantity of the work performed or the conduct of a prisoner-employee." *Id.* ¶ 25. "If Aramark is displeased with a prisoner-employee, it can tell the County that the prisoner-employee may not return to work for Aramark." *Id.* County Defendants and Aramark "arranged to divide the workday so that male prisoners are assigned to longer, daytime shifts, and female prisoners are assigned to shorter, nighttime shifts." *Id.* ¶ 26. County Defendants "determine which prisoners are eligible to work and place them in worker housing units," and Aramark "assigns prisoner-employees to their specific tasks." *Id.* ¶ 27.

The complaint alleges that "Sheriff's deputies threaten plaintiffs and other prisoner-employees of Aramark that if they refuse to work, they will receive lengthier jail sentences or be sent to solitary confinement, where they would be confined to a small cell for 22 to 24 hours a day." *Id.* ¶ 30; *see* ECF No. 182-1 at 108 (Ruelas deposition, threatened with longer confinement); ECF No. 182-1 at 154 (Davis interrogatory, same). Although it is undisputed that prisoner-employees of Aramark are subject to supervision and discipline by Sheriff's deputies, *see* ECF No. 182 at 19, the named plaintiffs' depositions do not support finding that the named plaintiffs were threatened with solitary confinement, *see* ECF No. 187 at 10. The complaint also alleges that deputies "threaten to terminate prisoners' employment if they need to take a sick day or are injured," ECF No. 160 ¶ 30, that such threats are sometimes made "in the presence of Aramark employees," *id.* ¶ 31, and that Aramark employees threaten "to report [prisoner-employees] to the Sheriff's deputies for punishment if they attempt to leave work early due to

United States District Court
Northern District of California

illness or injury," *id.* ¶ 32  However, Plaintiffs' testimony is mixed as to whether they experienced or observed such threats.  *See* ECF No. 187-1 at 48 (Abbey deposition, no threats by Aramark employees); *id*. at 60–61 (Cox deposition, Sheriff's deputy but not Aramark employee threatened plaintiff to make him work at the kitchen); *id*. at 76–79 (Davis deposition, Sheriff's deputies twice told him that it would not be possible for him to leave the kitchen early when he was sick); *id*. at 102 (Jones deposition, never threatened for trying to leave work at the kitchen early); *id*. at 117 (Mason deposition, Aramark employees never threatened her to prevent her from taking a sick day or leaving work early); *id*. at 136–37 (Reynolds deposition, testifying only that an Aramark employee once told him that if he did not leave the break room and come back to work, an officer would be sent to deal with him, which Reynolds understood to mean he would be fired from kitchen duty); *id*. at 151–52 (Ruelas deposition, never threatened by Aramark employees to coerce her not to take a sick day).

Kitchen workers are housed in a special housing unit, where they enjoy conditions superior to those in general inmate housing.  ECF No. 182-1 at 17 (Huking deposition); ECF No. 182-1 at 73–74 (Sims deposition, if someone is fired from or declines to continue working on the work crew, they get removed from worker housing); *id*. at 75 (Sims deposition, worker housing is less crowded which makes "the living conditions a little more tolerable").  Pretrial detainees in the jail live in perilous conditions with inedible food served on dirty trays.  ECF No. 182-1 at 126 (Cox deposition, describing dirty trays on which inmate food was served, including one that had a live baby mouse on it); *id*. at 148 (Davis deposition, describing bread served to inmates that mice had likely crawled over).  Those who work for Aramark, however, receive at least one edible meal.  ECF No. 160 ¶ 34 ("[W]orking in the kitchen means that plaintiffs can get out of their cells . . . and obtain additional food for their own enjoyment and nutrition."); ECF No. 182-1 at 127 (Cox deposition, kitchen workers got extra and better food); *id*. at 165 (Jones deposition, "We were told that we would get paid with a nice dinner."); *id*. at 173, 176 (Abbey deposition, the food for workers was "a little better"); *id*. at 182-1 at 32–33, 37–38 (Huking deposition, inmates are incentivized to work in the kitchens because they are provided with special food, which is better than jail food).

The nonworker men's housing is loud and unsafe, with violent fights and a level of activity that prevents prisoners from sleeping. ECF No. 182-1 at 124 (Cox deposition, describing the "Thunderdome"). Prisoners would be removed from worker housing and returned to regular housing if they chose to stop working. ECF No. 182-1 at 154 (Davis interrogatory); *id*. at 127 (Cox deposition); *see id*. at 145 (Davis deposition, testifying that individuals who are "rolled up" from the kitchen get sent to the Thunderdome, which is "not too nice," "not safe," where "[y]ou're going to get into altercations or you'll get attacked" and "you get no sleep" because "it's a madhouse . . . like the wild, wild west"). Furthermore, prisoners who worked in the kitchens received an extra mattress and a pillow. ECF No. 182-1 at 173.

In late October 2019, male prisoner workers, including those working for Aramark, staged a worker strike at Santa Rita "to advocate for improved conditions at the jail." ECF No. 160 ¶ 36. Plaintiffs allege that, in response, Sheriff's deputies forced female prisoners, including Plaintiffs Ruelas and Mason, to cover the men's shifts "so that Aramark could meet their quotas." *Id.* Deputies threatened these women by telling them they "would not be provided meals unless they worked." *Id.*

Plaintiffs moved for class certification on June 18, 2025. The County opposes the motion, ECF No. 186, as does Aramark, ECF No. 187. Plaintiffs filed a reply. ECF No. 195. The Court held a hearing on September 18, 2025.

## II.     LEGAL STANDARD

To certify a class, a court "must be 'satisfied, after a rigorous analysis,'" that the plaintiffs meet the requirements of Rule 23 of the Federal Rules of Civil Procedure by a preponderance of the evidence. *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 664–65 (9th Cir. 2022) (en banc) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982)). "[P]laintiffs must make two showings." *Id*. at 663. First, they must satisfy the numerosity, commonality, typicality, and adequacy requirements of Rule 23(a):

> One or more members of a class may sue or be sued as representative parties on behalf of all members only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class;

and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). Second, they "must show that the class fits into one of three categories" under Rule 23(b). *Olean*, 31 F.4th at 663.

"Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013). Thus, for example, "[i]n determining whether the 'common question' prerequisite is met, a district court is limited to resolving whether the evidence establishes that a common question is capable of class-wide resolution, not whether the evidence in fact establishes that plaintiffs would win at trial." *Olean*, 31 F.4th at 666–67. Courts "must take the substantive allegations of the complaint as true" but "need not accept conclusory or generic allegations regarding the suitability of the litigation for resolution through class action." *Keilholtz v. Lennox Hearth Prods. Inc.*, 268 F.R.D. 330, 335 (N.D. Cal. 2010) (citation omitted).

## III.    DISCUSSION

Plaintiffs seek to certify a Class of "all pretrial detainees who work or who have worked for Aramark in the Santa Rita Jail Kitchen during the period November 20, 2015 to the present, without compensation." ECF No. 182 at 8. They also seek to certify an "Equal Protection Subclass" of "all women who worked for Aramark in the Santa Rita Jail Kitchen during the period November 20, 2015 to the present, without compensation." *Id.* Defendants oppose the motion.

The County raises four arguments in opposition. First, the County argues that Plaintiffs cannot fairly and adequately represent the class, as Rule 23(a)(4) requires. Second, the County argues Plaintiffs cannot satisfy commonality under Rule 23(a)(2), nor can the Equal Protection Subclass. Third, the County argues that Plaintiffs cannot certify a Rule 23(b)(2) class because they primarily seek money damages, not injunctive and declaratory relief. Fourth, the County argues that Plaintiffs cannot satisfy predominance under Rule 23(b)(3).

Aramark argues first that Plaintiffs cannot certify unasserted constitutional claims against Aramark. Second, Aramark argues that Plaintiffs have failed to show any of the four Rule 23(a)

prerequisites. Third, Aramark argues Plaintiffs cannot pursue monetary relief under Rule 23(b)(2). And fourth, Aramark argues that Plaintiffs have not met the Rule 23(b)(3) prerequisites of predominance and superiority, including because Plaintiffs have not put forth a damages model.

### A.   Constitutional Claims Against Aramark

Plaintiffs' proposed Equal Protection Subclass "seeks relief from all defendants for plaintiffs' claim under the Equal Protection Clause of the Fourteenth Amendment." ECF No. 182 at 8. Aramark asks the Court to deny Plaintiffs' request to certify constitutional claims against it because Plaintiffs did not plead constitutional claims against Aramark in the complaint. ECF No. 187 at 8–9; *see* ECF No. 160 ¶¶ 62–64, 68–72. Plaintiffs do not respond to this argument. The Court accordingly denies certification of the Equal Protection Subclass against Aramark.[1] *See Sabra v. Maricopa County*, 44 F.4th 867, 881 (9th Cir. 2022) (failure to address an argument made in opposition amounts to abandonment of a claim), *abrogated on other grounds by FDA v. All. for Hippocratic Med.*, 602 U.S. 367 (2024).

### B.   Rule 23(a) Requirements[2]

### 1.   Numerosity

To be properly certified, a class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quotation omitted). Rule 23(a)(1) protects the unnamed parties' interests by allowing class certification only when it would be very difficult in practice to join all the affected parties. 1 William B. Rubenstein, Newberg on Class Actions § 3:12 (5th ed. 2014) ("Newberg").

There is no hard and fast rule for determining whether a class is sufficiently numerous. "The numerosity requirement is not tied to any fixed numerical threshold—it 'requires

---

[1] The County argues that Plaintiffs fail to identify a uniform policy or practice evincing gender discrimination that would support the finding of commonality required by Rule 23. ECF No. 186 at 26–27. Plaintiffs do not respond to this argument on reply. That is an independent reason to deny certification as to the Subclass.

[2] The Court addresses the Rule 23(a) requirements as to the Equal Protection Subclass for the sake of completeness although it has elsewhere determined that such subclass cannot be certified.

United States District Court
Northern District of California

examination of the specific facts of each case and imposes no absolute limitations.'" *Rannis v. Recchia,* 380 F. App'x 646, 651 (9th Cir. 2010) (quoting *Gen. Tel. Co. of the Nw., Inc. v. EEOC*, 446 U.S. 318, 330 (1980)).

> In some instances, courts have certified classes with as few as 16 members. In other cases, however, courts have declined certification on numerosity grounds where putative classes numbered as many as 258.

Newberg § 3:12 (citations omitted). Nonetheless, "precedent provides some guidance." *Rannis,* 380 F. App'x at 651. "A class or subclass with more than 40 members raises a presumption of impracticability of joinder." *West v. Cal. Servs. Bureau, Inc.*, 323 F.R.D. 295, 303 (N.D. Cal. 2017) (citation modified). On the other hand, a class with fewer than 20 does not. *Collinge v. IntelliQuick Delivery, Inc.*, No. 2:12-CV-00824 JWS, 2015 WL 1292444, at *10 n.104 (D. Ariz. Mar. 23, 2015) (quoting Newberg § 3:12); *Whaley v. Pac. Seafood Grp.*, No. 1:10-CV-3057-PA, 2012 WL 13047314, at *5 (D. Or. Jan. 31, 2012).

"When evaluating numerosity, courts should consider the number of class members, whether their identities are known, the geographical diversity of class members, the ability of individual claimants to institute separate suits, and whether injunctive relief is sought." *Sandoval v. M1 Auto Collisions Ctrs.*, 309 F.R.D. 549, 562 (N.D. Cal. 2015).

Aramark argues that Plaintiffs do not satisfy the numerosity requirement because they rely on records that do not distinguish between pretrial detainees and convicted inmates, and the Court has held that Plaintiffs may only bring claims for pretrial detainees. ECF No. 187.

The Court finds that Plaintiffs have sufficiently established numerosity. Plaintiffs' sampling analysis of the County's records indicates that more than 1,100 incarcerated persons worked for Aramark during the statutory period, including more than 110 women. ECF No. 182-3 ¶ 7; ECF No. 182-6 ¶ 7; *see Evans v. Linden Rsch., Inc.*, No. C 11-01078 DMR, 2012 WL 5877579, at *11 (N.D. Cal. Nov. 20, 2012) ("Although the exact size of the proposed class currently is not known, the sampling evidence satisfies the numerosity requirement, based on a common sense extrapolation of the numbers . . . . "). Although this number includes both pretrial and convicted persons, Plaintiffs present the testimony of the County's 30(b)(6) designee that "the

majority" of persons housed at Santa Rita Jail "are pretrial inmates." ECF No. 182-1 at 62:13–19.

This is sufficient evidence of numerosity. *See Moeller v. Taco Bell Corp.*, 220 F.R.D. 604, 608 (N.D. Cal. 2004), *amended in part*, No. C 02-5849 PJH, 2012 WL 3070863 (N.D. Cal. July 26, 2012) ("A court may make common sense assumptions to support a finding that joinder would be impracticable."). Even assuming that only 50% of the persons housed at Santa Rita Jail during the statutory period were persons detained pretrial, the Class would still comprise roughly 600 members and the Subclass would contain roughly 55. This is more than enough to satisfy Rule 23's numerosity requirement. *West*, 323 F.R.D. at 303 ("A class or subclass with more than 40 members raises a presumption of impracticability of joinder.") (citation modified).

### 2. Commonality and Rule 23(b)(3) Predominance

"Commonality" is a shorthand way of describing Rule 23's requirement that "there [be] questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "[F]or purposes of Rule 23(a)(2) [e]ven a single [common] question will do." *Dukes*, 564 U.S. at 359 (internal citation omitted). Where questions common to class members present significant issues that can be resolved in a single adjudication, "there is clear justification for handling the dispute on a representative rather than on an individual basis." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997) (internal quotation marks and citation omitted). However, the common contention "must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350.

The Rule 23(b)(3) predominance requirement is "even more demanding" than Rule 23(a)'s commonality counterpart. *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013). To certify a Rule 23(b)(3) class, Plaintiffs must show that the common questions "predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). "Considering whether 'questions of law or fact common to class members predominate' begins . . . with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011). "In determining if common questions predominate, the Court identifies the substantive issues related to plaintiff's claims and then considers the proof necessary to establish each element of the claim,

8

and then considers how these issues would be tried." *Moore v. GlaxoSmithKline Consumer Healthcare Holdings (US) LLC*, 713 F. Supp. 3d 660, 677 (N.D. Cal. 2024) (citation omitted). The predominance inquiry requires that Plaintiffs demonstrate that common questions predominate as to each cause of action for which they seek class certification. *See Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1068 (9th Cir. 2014), *abrogated on other grounds by Microsoft Corp. v. Baker*, 582 U.S. 23 (2017). Given the relationship between Rule 23(a)'s commonality requirement and Rule 23(b)(3)'s predominance requirement, courts often analyze those requirements together. *See, e.g., Aberin v. Am. Honda Motor Co., Inc.*, No. 16-CV-04384-JST, 2021 WL 1320773, at *7 (N.D. Cal. Mar. 23, 2021).

With respect to their TVPA, Thirteenth Amendment, and Bane Act claims, Plaintiffs offer the common question of whether class members were coerced to work. ECF No. 182 at 20. Plaintiffs argue that Defendants' policies and practices create an environment for all incarcerated persons that coerces their labor in the Santa Rita Jail kitchen. *Id*. at 21. These policies and practices consisted in providing Aramark prisoner-employees with a "housing unit [that] has more tolerable conditions and is organized, clean and stable," higher-quality food, "more food, more movement, more time out of their cells, and more social interactions with people who are not incarcerated." *Id.*

The problem with this conditions-of-confinement argument is that it is not pleaded in the complaint. *See Brown v. Am. Airlines, Inc.*, 285 F.R.D. 546, 560 (C.D. Cal. 2011) ("Class certification is not a time for asserting new legal theories that were not pleaded in the complaint."). While the complaint notes that kitchen workers received better food, it does not argue that prisoners were coerced to work through by the threat of poor food and housing conditions. *See* ECF No. 160 ¶ 34 ("working in the kitchen means that plaintiffs can get out of their cells . . . and obtain additional food for their own enjoyment and nutrition").

In the complaint, Plaintiffs do allege that "Sheriff's deputies threaten plaintiffs and other prisoner-employees of Aramark that if they refuse to work, they will receive lengthier jail sentences or be sent to solitary confinement . . . . County of Alameda Sheriff's deputies also threaten to terminate prisoners' employment if they need to take a sick day or are injured." ECF

9

No. 160 ¶ 30.  This theory, however, was waived in the class certification briefing.  *See* ECF No. 182 at 20 (arguing that a common question of coerced labor exists because kitchen workers are provided "an edible meal, more tolerable and less dangerous living conditions, reduction of otherwise forced idleness, and more socialization").

The record suggests a sound basis for Plaintiffs' decision to waive the complaint's theory of threats of solitary confinement, longer sentences, or termination of employment:  multiple named plaintiffs testified that they either were not subjected to such threats or did not experience them as coercive.  *See* ECF No. 187 at 17.  If the jail maintained a common policy of applying such threats to coerce labor, then the Court would expect the various named Plaintiffs to have experienced or been affected by that policy.  *Cf. Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001), *abrogated on other grounds by Johnson v. California*, 543 U.S. 499, 504–05 (2005) (holding that the requirement for "commonality is satisfied where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members").  On the record before the Court, however, determining liability would require making individualized inquiry.  Moreover, even if Plaintiffs had not waived their "threats" theory, and it were sufficient for Plaintiffs to have been aware of such a policy of using threats to coerce labor,[3] the fact that most of them experienced no such threats poses a typicality problem, discussed further below.

Plaintiffs also argue Defendants maintained a practice of employing class members without compensation.  ECF No. 182 at 18.  Whether Defendants indeed engaged in this practice is a common question for the class.  *See Siino v. Foresters Life Ins. & Annuity Co.*, 340 F.R.D. 157, 163 (N.D. Cal. 2022) (commonality satisfied by common questions of whether defendant "maintained a practice of not complying with [certain insurance] [s]tatutes" and "whether that conduct satisfies an element of class members' breach of contract or UCL claims").

The County argues that the determination of whether class members actually were

---

[3] On this point, see *Owino v. CoreCivic, Inc.*, No. 17-CV-1112 JLS (NLS), 2020 WL 1550218, at *28 (S.D. Cal. Apr. 1, 2020) (noting that TVPA liability is judged from the perspective of a reasonable person in the plaintiff's position, and finding common questions predominate in a TVPA suit based on "threats . . . communicated to the class as a whole through Defendant's uniform disciplinary policy"); *Richardson v. City of Antioch*, 722 F. Supp. 2d 1133, 1147 (N.D. Cal. 2010) (noting that Bane Act claims are also judged using a reasonable person standard)

10

employed without compensation will require individualized inquiry because of the existence of the civic duty exception.  ECF No. 186 at 21–22; *see United States v. Kozminski*, 487 U.S. 931, 943–44 (1988) ("[T]he Court has recognized that the prohibition against involuntary servitude does not prevent the State or Federal Governments from compelling their citizens, by threat of criminal sanction, to perform certain civic duties.").  But "[t]he availability of such [individualized affirmative] defenses . . . is not pertinent to the commonality question, as long as there is *a* common question as to [plaintiffs'] prima facie case . . . . " *Stockwell v. City & County of S.F.*, 749 F.3d 1107, 1113 n.3 (9th Cir. 2014) (emphasis in original).

Although the Court agrees that the question of whether class members worked without compensation is one that is common to the class, whether it is a necessary element of Plaintiffs' prima facie case is another question.  Aramark argues that the question of work without compensation "is now wholly irrelevant given the dismissal of Plaintiffs' Labor Code claims." ECF No. 187 at 15.  Plaintiffs respond that "[t]he uncompensated nature of plaintiffs' work is integral to their UCL, TVPA, and Thirteenth Amendment claims."  ECF No. 195 at 10.  The Court concludes that the TVPA and Thirteenth Amendment claims rest on proof of work under coercion, not without compensation—as Plaintiffs acknowledge.  ECF No. 182 at 20 (quoting *United States v. Kozminski*, 487 U.S. 931, 952 (1988) ("'[I]nvoluntary servitude [under the Thirteenth Amendment] necessarily means a condition of servitude in which the victim is forced to work for the defendant by the use or threat of physical restraint or physical injury, or by the use of threat of coercion through law or the legal process.")); *see also* 18 U.S.C. § 1589(a) (describing conditions for a TVPA claim, which include "force, threats of force, physical restraint, or threats of physical restraint," "serious harm or threats of serious harm," abuse or threatened abuse of law or legal process," or any scheme to cause the victim to believe they will suffer serious harm or physical restraint).  And as to unfairness under the UCL, this Court's prior order on defendants' motion to dismiss upheld the UCL claim precisely because of the TVPA and Bane Act claims.  ECF No. 171 at 8–10.  Those claims are no longer viable and Plaintiffs have not shown that the failure to compensate Plaintiffs alone is sufficient to support a UCL claim.  Therefore, although the lack of compensation is a common question, it is not a material one.

Because commonality is not met, the "far more demanding" threshold for predominance is also not. *Amchem*, 521 U.S. at 624. The Court accordingly will deny the motion on that basis.

### 3.    Typicality

Typicality exists if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "The test of typicality is 'whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'" *Parsons v. Ryan*, 754 F.3d 657, 685 (9th Cir. 2014) (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)). "Typicality is a 'permissive standard[]' " that "'refers to the nature of the claim . . . of the class representative, and not to the specific facts from which it arose or the relief sought.'" *Johnson v. City of Grants Pass*, 50 F.4th 787, 805 (9th Cir. 2022), *rev'd on other grounds*, 603 U.S. 520 (2024) (alteration in original) (first quoting *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003); and then quoting *Parsons*, 754 F.3d at 805). "[C]lass certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." *Hanon*, 976 F.2d at 508 (citation and quotation omitted). However, "[t]he mere fact that a putative class representative, whose claims arise from the same course of events and are based upon the same legal theory as the other members of the proposed class, is subject to a unique defense does not render her atypical for purposes of class action certification unless that defense threatens to become the focus of litigation thereby prejudicing the absent class members." *Lewis v. First Am. Title Ins. Co.*, 265 F.R.D. 536, 557 (D. Idaho 2010) (quoting *Swack v. Credit Suisse First Bos.*, 230 F.R.D. 250 (D. Mass. 2005)). "The test of typicality is 'whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.' Thus, '[t]ypicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought.'" *Parsons*, 754 F.3d at 685 (quoting *Hanon*, 976 F.2d at 508).

Aramark argues that Plaintiffs have not shown typicality because some of the Plaintiffs

12

volunteered to work in the kitchen and some testified they were never threatened by Aramark staff. ECF No. 187 at 20–21. The Court agrees that Plaintiffs have failed to show that they were injured in a manner common to the class resulting from a common policy. *Parsons*, 754 F.3d at 685. The Court finds Plaintiffs have therefore not satisfied the typicality requirement.

### 4.    Adequacy

When considering the adequacy of a proposed class, courts consider two questions: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998), *overruled on other grounds by Dukes*, 564 U.S. 338.

The County argues that Plaintiffs Ruelas, Jones, and Mason are not adequate representatives for the Equal Protection Subclass because the interests of the Subclass are at odds with the class: the class seeks to attack the policies around work in the Santa Rita Jail kitchen while the Subclass seeks more opportunity to work under those policies. ECF No. 186 at 18. The County cites no legal authority for this argument, and the Court does not see this as a conflict of interest. The female Plaintiffs in the Subclass can seek equal opportunity to work in the kitchen, in light of the benefits the work provides, while still challenging the allegedly coercive nature of the work. In any event, the Court has denied certification of the Equal Protection Subclass for the reasons set forth above, and so there is no longer any risk of conflict.

The County also argues that Plaintiffs cannot adequately represent the interests of class members in claims for injunctive or declaratory relief because Defendants stopping using pretrial detainees for work in the Santa Rita Jail kitchen in October 2023, and because Plaintiffs' claims "seek to undermine or declare unlawful practices that previously benefitted unnamed class members" by providing vocational opportunities. ECF No. 186 at 18–19. Plaintiffs respond that "Defendants[] cite no change in the challenged policy that allows them to carry on the work program" and thus the challenged conduct is capable of repetition. ECF No. 195 at 16. Plaintiffs have the better argument. Moreover, "the fact that illegal [conduct] operate[s] to the economic advantage of certain class members" is not "enough to defeat class certification." *In re Nat'l Coll.*

13

*Athletic Ass'n Athletic Grant-In-Aid Cap Antitrust Litig.*, 311 F.R.D. 532, 542 (N.D. Cal. 2015) (agreeing with plaintiffs' argument that "Defendants should not be heard to argue that class certification should be denied because some members of the proposed classes might be benefitted by, and thus prefer, continuation of antitrust violations").

Finally, Aramark argues that Plaintiffs Mason and Ruelas's criminal convictions for bank fraud preclude their serving as class representatives. ECF No. 187 at 21. But "[m]ost courts have rejected the contention that a proposed representative is inadequate because of prior unrelated unsavory, unethical, or even illegal conduct." *Yucesoy v. Uber Techs., Inc.*, No. C-15-262 EMC, 2015 WL 4571547, at *3 (N.D. Cal. July 28, 2015) (quoting Newberg on Class Actions § 3.68 (5th ed. 2015).

### C.    Rule 23(b)(2)

Rule 23(b)(2) requires that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole . . . . " Fed. R. Civ. P. 23(b)(2). "Class certification under Rule 23(b)(2) is appropriate only where the primary relief sought is declaratory or injunctive." *Ellis*, 657 F.3d at 986 (internal quotation marks and citation omitted); *see also Dukes*, 564 U.S. at 362 (emphasizing that "individualized monetary claims belong in Rule 23(b)(3)" and not in Rule 23(b)(2)). This distinction protects the rights of absent class members because Rule 23(b)(2) does not permit class members to opt out of the class or "even oblige the District Court to afford them notice of the action." *Id.* at 362. "The absence of these protections in a class action predominantly for monetary damages violates due process." *Ellis*, 657 F.3d at 987.

The Court cannot say here that the "primary relief sought is declaratory or injunctive." Plaintiffs seek monetary recovery for class members for past conduct, and that recovery cannot be said to be merely "incidental to the injunctive or declaratory relief." *Dukes*, 564 U.S. at 360. Plaintiffs' motion for class certification under Rule 23(b)(2) is therefore denied.

### D.    Rule 23(b)(3)

Rule 23(b)(3) requires "that the questions of law or fact common to class members

predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).  Having addressed predominance with commonality, *supra*, the Court turns to superiority.

"Superiority" refers to whether the class-action device is "superior to other methods of litigation." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996).  "'[T]he purpose of the superiority requirement is to assure that the class is the most efficient and effective means of resolving the controversy.'" *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) (quoting 7AA Charles Wright, Arthur Miller & Mary Kay Kane, Federal Practice and Procedure § 1779 (3d ed. 2005)).  In determining superiority, courts consider the four factors set forth in Rule 23(b)(3): "(1) the class members' interests in individually controlling a separate action; (2) the extent and nature of litigation concerning the controversy already begun by or against class members; (3) the desirability of concentrating the litigation in the particular forum; and (4) the manageability of a class action." *Hodges v. Akeena Solar, Inc.*, 274 F.R.D. 259, 270–71 (N.D. Cal. 2011).

The claims here fit comfortably within the category for which the class action was designed.  "The class action procedure exists, in part, for the benefit of plaintiffs with small claims who could not otherwise vindicate their rights." *Viernes v. DNF Assocs., LLC*, No. CV 19-00316 JMS-KJM, 2020 WL 6938010, at *9 (D. Haw. Nov. 23, 2020) (quoting *Kaplan v. Pomerantz*, 131 F.R.D. 118, 122 (N.D. Ill. 1990)), *report and recommendation adopted*, No. CV 19-00316 JMS-KJM, 2021 WL 225327 (D. Haw. Jan. 22, 2021); *see also Meijer, Inc. v. Abbott Lab'ys*, No. C 07-5985 CW, 2008 WL 4065839, at *10 (N.D. Cal. Aug. 27, 2008) ("A class action offers those with small claims the opportunity for meaningful redress.")  As Plaintiffs note, class members' status as incarcerated persons—either currently or formerly—makes it even more unlikely that they would be able to pursue litigation on their own. ECF No. 182 at 31.  And "the adjudication of [a] matter through a class action [is] superior to no adjudication of the matter at all." *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 427, 426 (4th Cir. 2003); *see also Rodriguez v. Carlson*, 166 F.R.D. 465, 480 (E.D. Wash. 1996) (class members' "presumably limited understanding of the legal system . .

15

. and their generally indigent status" made it "highly unlikely that the individual plaintiffs would pursue this litigation if class certification were not allowed," justifying a finding of superiority (quoting *Leyva v. Buley,* 125 F.R.D. 512, 518 (E.D. Wash. 1989))). The Court finds Plaintiffs have met the superiority requirement.

### E.    A Reliable Damages Model

"Rule 23(b)(3)'s predominance requirement takes into account questions of damages." *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1120 (9th Cir. 2017). "[P]laintiffs must establish at the certification stage that 'damages can feasibly and efficiently be calculated once the common liability questions are adjudicated.'" *Lilly v. Jamba Juice Co.*, 308 F.R.D. 231, 244 (N.D. Cal. 2014) (quoting *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013)) (citation modified). "A plaintiff must present a likely method for determining class damages, though it is not necessary to show that his method will work with certainty at this time." *In re Tesla Advanced Driver Assistance Sys. Litig.*, 350 F.R.D. 119, 134 (N.D. Cal. 2025) (citation and quotation omitted).

Aramark argues that "Plaintiffs . . . do not offer any method, let alone a classwide method, for calculating damages." ECF No. 187 at 27. The Court agrees.

In their opening brief, Plaintiffs argue that damages "would be easily calculable as a set amount of renumeration multiplied by the hours per shift, which is consistent, and by the days the person worked . . . . Monetary damages would flow directly from the determination of liability, and the damages are "capable of computation by means of objective standards and not dependent in any significant way on the intangible, subjective differences of each class member's circumstances." ECF No. 182 at 29. They do not specify what the "amount of renumeration" might be, why that amount would be the appropriate remedy for the class's claims, or how to identify the "hours per shift" or "the days the person worked." Plaintiffs' reply brief does not respond to Aramark's damages argument at all.

Plaintiffs' assertions boil down to a claim that Plaintiffs *could* calculate damages without an explanation as to *how* they would do so. Plaintiffs are correct that "[c]lass action plaintiffs may rely on an unexecuted damages model to demonstrate that damages are susceptible to common

16

proof, so as to satisfy the predominance requirement for class certification." ECF No. 187 at 30 (citing *Lytle v. Nutramax Lab'ys, Inc.,* 114 F.4th 1011, 1024 (9th Cir. 2024), *cert. denied*, 145 S. Ct. 1308 (2025)). But Plaintiffs do not propose *any* damages model, unexecuted or otherwise. "Merely gesturing at a model or describing a general method will not suffice to meet this standard. Rather, plaintiffs—or their expert—must chart out a path to obtain all necessary data and demonstrate that the proposed method will be viable as applied to the facts of a given case." *Lytle*, 114 F.4th at 1032. Nor have they identified the evidence to which such a method could be applied. In fact, even though the Court has previously held that only pretrial inmates may bring claims in this case, ECF No. 46 at 17–19, the only records Plaintiffs cite "do not differentiate between pretrial detainees and persons who have been convicted and sentenced"—and so, by definition, would be insufficient.[4]

Shin v. Sanyo Foods Corp. of Am.*, 348 F.R.D. 477 (C.D. Cal. 2025), is instructive. In that case, plaintiff filed a putative class action regarding Sanyo's Sapporo Ichiban Miso Ramen. *Id.* at 481. The ramen was labeled as having "0g trans fat," but contained palm oil, which plaintiff alleged caused the product to have "some trans fat." *Id.* At the class certification stage, Plaintiff "propose[d] that the court calculate class damages through either a full refund model or conjoint analysis for premium price model." *Id.* at 485. But "[p]roposing that the Court apply one of those two models . . . [was] the full extent of Plaintiff's damages analysis . . . . In fact, Plaintiff did not even retain a damages expert." *Id.* Because plaintiff failed to "chart out a path to obtain all necessary data and demonstrate that the proposed method will be viable as applied to the facts of [the] case," the court denied certification. *Id.* at 484.

At first blush, *Owino v. CoreCivic, Inc.*, 60 F.4th 437 (9th Cir. 2022), would seem to assist plaintiffs. In that case, the putative class consisted of individuals who were incarcerated in private

---

[4] The Supreme Court has held that in certain situations, "a representative sample may be used to establish classwide liability." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 455, 460 (2016). Plaintiffs have not attempted to rely on this method of calculating damages, however, which would require obtaining a representative sample and then extrapolating from that sample to determine the likely injury to each individual class member. *See Galvan v. First Student Mgmt., LLC*, No. 18-CV-07378-JST, 2022 WL 20016825, at *5 (N.D. Cal. Aug. 23, 2022) (discussing expert's failure to conduct sampling).

United States District Court
Northern District of California

immigration detention facilities owned and operated by a for-profit corporation, CoreCivic, Inc. *Id.* at 441. They had not been charged with, or convicted of, any crime. *Id.* They alleged "that the overseers of their private detention facilities forced them to perform labor against their will and without adequate compensation." *Id.* As Aramark does here, CoreCivic argued that no class could be certified because plaintiffs had not presented "a fully formed damages model." *Id.* at 447. The Ninth Circuit rejected that argument, finding that "Owino presented sufficient evidence to show that damages are capable of measurement on a class-wide basis. This evidence includes documentation of 'typical' shift lengths, the days worked by ICE detainees, the wages paid, and the job assignments." *Id.* (emphasis omitted). The court also noted that damages would be measured by the minimum hourly wage required by California law. *Id.* Unlike in *Owino*, Plaintiffs have put forward neither the measure of damages suffered by each plaintiff nor the evidence necessary to calculate such a measure.

The Court therefore concludes that Plaintiffs have failed to establish a reliable damages model, providing an additional reason that the class cannot be certified as to damages.

## CONCLUSION

For the foregoing reasons, the Court denies the motion to certify the class, including with regard to the Equal Protection Subclass and to a class under Rule 23(b)(2). The Court will conduct a case management conference on May 8, 2026 at 1:30 p.m. An updated joint case management statement is due May 1, 2026.

**IT IS SO ORDERED.**

Dated: March 30, 2026

_____
JON S. TIGAR
United States District Judge

United States District Court
Northern District of California

18